# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2022-CA-00498-SCT

*JILL B. LANDRUM AND DAVID LANDRUM*

*v.*

*LIVINGSTON HOLDINGS, LLC, B&S MS
HOLDINGS, LLC, LOS ROBLES INVESTMENT
PROPERTIES, LLC, LOS ROBLES MS
INVESTMENT PROPERTIES, LLC, MICHAEL C.
BOLLENBACHER, ROBERT YAMAMOTO,
TAGGART, RIMES & GRAHAM, PLLC, MICHAEL
L. SHARPE, MARNA SHARPE, JAMIE PLANCK
MARTIN, JAMIE PLANCK MARTIN, LLC,
GENYSYS MS INVESTMENT PROPERTIES, LLC,
PROVIDENCE HILL FARM, LLC, PROVIDENCE
HILL FARM SPORTING CLUB, LLC, CHESTNUT
DEVELOPERS, LLC AND CHESTNUT HILL, LLC*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/22/2022 |
| TRIAL JUDGE: | HON. JAMES CHRISTOPHER WALKER |
| TRIAL COURT ATTORNEYS: | KATHY K. SMITH |
| | WILLIAM H. LEECH |
| | CHARLES M. MERKEL, JR. |
| | LUKE DOVE |
| | EDWARD P. CONNELL, JR. |
| | D. STERLING KIDD |
| | JAMES W. JANOUSH |
| | EMILY KINCSES LINDSAY |
| | MICHAEL REID JONES |
| | BREANNA F. G. YOUNG |
| | STEVEN H. SMITH |
| | JOHN G. CORLEW |
| | LYNN C. WALL |
| | PAUL B. WATKINS, JR. |
| | J. CARTER THOMPSON, JR. |
| | G. TODD BURWELL |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CHANCERY COURT |

ATTORNEYS FOR APPELLANTS:     JAMES W. JANOUSH
                              HARRIS H. BARNES, III
ATTORNEYS FOR APPELLEES:      LYNN C. WALL
                              PAUL B. WATKINS, JR.
                              BREANNA F.G. YOUNG
                              STEVEN H. SMITH
                              J. CARTER THOMPSON, JR.
                              D. STERLING KIDD
                              G. TODD BURWELL
NATURE OF THE CASE:           CIVIL - OTHER
DISPOSITION:                  ON DIRECT APPEAL: AFFIRMED IN PART;
                              REVERSED AND REMANDED IN PART.
                              ON CROSS-APPEAL: REVERSED AND
                              REMANDED - 07/18/2024
MOTION FOR REHEARING FILED:

**EN BANC.**

**CHAMBERLIN, JUSTICE, FOR THE COURT:**

¶1.    Two friends go into business together. While it sounds like the start of a bad joke it is, in fact, often the start of a bitter lawsuit.[1] This appeal involves a garden-variety monetary dispute that germinated from a deal between David and Jill Landrum and Michael and Marna Sharpe involving a mixed-use development known as the Town of Livingston. The deal went sideways in large part due to Jill Landrum's failure to make her agreed-upon payments. This dispute sprouted into animosity and bloomed into full warfare as other entities became involved. Multiple issues are before this Court. On direct appeal, we affirm in part and reverse and remand in part. On cross-appeal, we reverse and remand.

_____

[1] As John D. Rockefeller once said, "A friendship built on business can be glorious, while a business built on friendship can be murder." The dissent takes exception to Rockefeller's choice of metaphor. Likewise, the dissent takes umbrage to the equally metaphoric use of the word "warfare." They are merely common terms used in many phrases (i.e., "The schedule is murder," "war on drugs," etc.). "Sticks and stones" apparently no longer applies.

2

**FACTS AND PROCEDURAL HISTORY**

¶2. In 2006, David and Jill Landrum and their friends Michael and Marna Sharpe purchased land in Madison County. Their plan was to develop this property into a hundred-million-dollar "quasi-commercial, quasi-residential development" known as the Town of Livingston (Livingston). But the project stalled for some time due to the 2008 financial crisis and an appeal over the grant of planned unit development (PUD) status to Livingston. *See Madison Citizens Against Rezoning v. Madison Cnty. Bd. of Supervisors*, 101 So. 3d 711 (Miss. Ct. App. 2012).

¶3. In 2006 and 2007, David and Michael formed two companies that they would use to develop Livingston. Chestnut Hill, LLC (Chestnut Hill), contained property to be developed into "a residential subdivision consisting of approximately one hundred (100) lots; and Chestnut Developers, LLC (Chestnut Developers)[,] owned the property that" became the Livingston development. In 2009, David and Michael added to the property fourteen acres of land that they financed and bought from Gus Primos.

*I. Livingston Holdings, LLC*

¶4. In 2010, Jill and Marna formed Livingston Holdings as a Mississippi LLC. Livingston Holdings became the owner of Chestnut Hill and Chestnut Developers. Jill and Marna's ownership interests were equal. Eventually, however, Marna, began to contribute more than Jill both due to additional loans to the company and lack of payments from Jill.

¶5. Ownership interest was periodically increased based on the actual capital contributions made by Marna and Jill. On May 28, 2013, a First Amended and Restated

3

Memorandum of Understanding was entered into by Marna and Jill to recognize the disparity in contributions and ownership interests. In July 2014, Marna and Jill entered into a Second Amended and Restated Memorandum of Understanding and Amendment to Operating Agreement for Livingston Holdings (Second MOU).

¶6.     The Second MOU further recognized the disparity in the capital contributions and ensured that Marna could recoup her investment. It established Marna's ownership of Livingston Holdings at 51 percent and Jill's ownership at 49 percent. The excessive contributions by Marna over those of Jill in the amount of $2,325,277.48 were converted to a demand promissory note that was due and owing from Livingston Holdings to Marna.

¶7.     Marna and Jill both agreed in the Second MOU to pay Livingston Holdings a monthly sum of $14,000 for operating expenses. Jill paid her $14,000 monthly contribution through December 2018 but has since made no monetary contribution under the Second MOU.

### II.     Los Robles and the Joint-Venture Agreement

¶8.     In the fall of 2010, the Landrums and the Sharpes contacted Mike Bollenbacher and Robert Yamamoto to provide equity, financing and development expertise. Bollenbacher and Yamamoto participated and invested through Los Robles Investment Properties, LLC (Los Robles).[2] On September 15, 2010, Los Robles and Livingston Holdings formally recognized their roles in the development through a joint-venture agreement (JVA).

---

[2]It is agreed by the parties that although at the time of the agreement Los Robles represented that it was a California LLC, it was not properly formed with the California secretary of state.

4

¶9. The JVA indicated that it was for "the purpose of developing and managing the civic, commercial and residential real estate project known as 'Livingston Township[,]'" which consisted of 47.2 acres in Madison County. Further, the JVA specifically called for the new venture to be named Livingston Development Partners, LLC (Livingston Partners), and also provided that Livingston Partners would be owned equally by Los Robles (50 percent) and Livingston Holdings (50 percent). Los Robles would oversee the financing and development of Livingston Township. Livingston Holdings would handle the public relations and marketing activities and sell the property necessary for the development of Livingston Township, LLC (Livingston Township), to the joint venture. The JVA also stated that "the project is a phased project" and that "[t]he Joint Venture shall create new entities to fund each phase of the project."

¶10. By 2012, David and Michael had fallen behind on the payments to Primos. To avoid foreclosure, Yamamoto purchased the property through his company Genysys MS Investment Properties, LLC (Genysys). Genysys offered David and Michael an "Option to Purchase Real Property" and extended the option offer until December 31, 2014. The option was not exercised, and Genysys still owns the Primos property.

¶11. In November 2014, Marna sold her 51 percent interest in Livingston Holdings to B&S Mississippi Holdings (B&S). Marna and Bollenbacher created B&S and have equal ownership in the entity. Bollenbacher is the manager of B&S. Bollenbacher, through his interest in B&S, is also managing Livingston.[3]

---

[3]The chancellor noted in his order that Bollenbacher is the manager of Livingston, and Defendants claim in their brief that Bollenbacher is the manager of Livingston.

### III. Cascade Group and the Bank Plus Note

¶12. In 2011, David, Chestnut Developers and Livingston Holdings executed a promissory note with BankPlus in the amount of $978,287.17 secured by a deed of trust on the property.

¶13. In 2012, David and Michael engaged Cascade Capital Group, LLC (Cascade), a consulting group, to assist with the development of Livingston. Cascade's sole member was Mark Calvert. Calvert was to assist in reorganization, the attraction of additional equity and investors and the restructuring of debt. Calvert recommended to Livingston Holdings that it should "develop approximately fifty (50) residential dwellings to be known as the 'Cottages,'" which Calvert projected would make a profit of more than three million dollars. The Landrums viewed the development as a means to recover their investments and satisfy their monetary obligations to BankPlus.

¶14. "The BankPlus note matured December 15, 2013, and Livingston [Holdings] was unable to pay off the balance[.]" *Cascade Cap. Grp., LLC v. Livingston Holdings, LLC*, No. 3:17CV952-LG-MTP, 2019 WL 438488, at *1 (S.D. Miss. Feb. 4, 2019), *aff'd*, 841 F. App'x 645 (5th Cir. 2020). After discussion with David and Michael, Calvert personally bought the promissory note from BankPlus in March 2014. Then, in April 2014, Chestnut Developers executed a deed of trust in favor of Cascade. The terms of this note provided that

---

Livingston's online business registration with the secretary of state evidences that B&S is named as the managing member of Livingston. *See Weeks, Inc v. Lewis*, 335 So. 3d 1049, 1053 (Miss. 2022) (finding that the "Court may take judicial notice of the official records of the Secretary of State." (internal quotation mark omitted) (quoting *May v. State*, 240 Miss. 361, 127 So. 2d 423, 426 (1961))).

the Landrums and Sharpes would pay Calvert and Cascade the sum of $951,147.[4] The parties also entered into a forbearance agreement. Calvert continued billing Livingston for his consulting services while also operating as a lender to the project and requiring payment from Livingston under the note. *Cascade Cap. Grp., LLC*, 2019 WL 438488 at *4.

¶15. On December 1, 2017, Calvert filed suit in federal district court against Livingston Holdings, Chestnut Developers, David and Michael requesting receivership of the property as Cascade's collateral and for a judgment on amounts then due under the note. *Id.* at *8. David admitted all allegations in Cascade's complaint, and a judgment on the pleadings was granted in favor of Cascade against David. *Cascade Cap. Grp, L.L.C. v. Landrum*, 846 Fed. App'x. 253, 254 (5th Cir. 2021).[5] Livingston, Chestnut Developers and Michael filed counterclaims for breach of fiduciary duty and breach of good faith and fair dealing.

¶16. The federal court concluded that Cascade was entitled to summary judgment on its breach-of-contract claim and ruled in Cascade's favor on defendants' breach of the duty of good faith and fair dealing counterclaim. *Cascade Cap. Grp., LLC*, 2019 WL 438488 at *16. Livingston, Chestnut Developers and Michael eventually won their counterclaim against Cascade for breach of fiduciary duty. *Cascade Cap. Grp. LLC*, 2020 WL 1076049 at *12.

---

[4]This amount included both the amount from the BankPlus note, Calvert's professional services fee and other fees and interests. *Id.* at *4. The note was signed by Jill and Marna "as members of Livingston and Michael Sharpe and David Landrum executed in their individual capacities." *Cascade Cap. Grp. LLC v. Livingston Holdings, LLC*, No. 3:17CV952-LG-MTP, 2020 WL 1076049, at *3 (S.D. Miss. March 6, 2020).

[5]This judgment resulted in an award to Cascade of "$1,030,370 in damages from Landrum as well as attorney's fees and costs." *Cascade Cap. Grp., L.L.C.*, 846 Fed. Appx. at 254-55.

David and Jill Landrum testified on behalf of Cascade but were not otherwise allowed to participate in the trial. *Id.* n.1.

  *IV. The Present Appeal*

¶17. David and Jill filed their original complaint in this case on June 6, 2019. The complaint asserted claims in David and Jill's individual capacities as well as Jill, as a derivative plaintiff "on behalf of Livingston Holdings, LLC[,] as a Member of Livingston Holdings, LLC"; "on behalf of Chestnut Hill, LLC, a wholly-owned subsidiary of Livingston Holdings, LLC"; and "on behalf of Chestnut Developers, LLC, a wholly owned subsidiary of Livingston Holdings, LLC."

¶18. The complaint brought a variety of claims against the Sharpes, B&S, Bollenbacher, Los Robles and other people and entities for actions taken during the course of developing Livingston, which the Landrums alleged "effectively doom[ed] the business venture[.]" The complaint stated that the defendants and their entities "blatantly and repeatedly" violated various agreements and breached their fiduciary duties. There were a total of twenty-eight defendants, including twelve John Does and attorneys and law firms that had represented various parties. All defendants answered the complaint, and two counterclaims were asserted.

¶19. On November 14, 2019, Livingston, through separate counsel, filed a motion to realign as a party defendant and to file a counterclaim against the Landrums or, in the alternative, to file a cross-claim against the Landrums. The motion argued that B&S was the majority member of Livingston, and Jill was not qualified to serve as its representative in a

derivative proceeding. It also alleged that "Livingston Holdings, LLC seeks damages of and from David Landrum and Jill  Landrum in the amount of Five Million Dollars ($5,000,000) compensatory damages and Fifteen Million Dollars ($15,000,000) punitive damages."

¶20.    On February 13, 2020, B&S filed a motion to disqualify Jill as a derivative plaintiff. B&S argued that Jill was not a proper plaintiff because she "does not fairly and adequately represent the interests of the limited liability company and therefore lacks standing to bring the derivative action" under Mississippi Code Section 79-29-1103 (Rev. 2013).

¶21.    At a hearing on May 21, 2020, the chancellor heard arguments and granted both the motion to realign and the motion to disqualify. On June 2, 2020, the chancellor entered orders that Livingston be realigned from a plaintiff to a defendant and that Jill be disqualified as a derivative plaintiff.

¶22.    Two days later, on June 4, 2020, Jill filed a motion for findings of fact and conclusions of law on the derivative standing order pursuant to Mississippi Rule of Civil Procedure 52(a). The chancellor denied the motion. Jill then filed a motion to certify the derivative standing order under Mississippi Rule of Civil Procedure 54(b).  That motion was also denied.

¶23.    As a result of the realignment of Livingston, an "Agreed Order Dismissing Certain Defendants" was entered on May 4, 2021.  Attorney Jamie Planck Martin, Jamie Planck Martin, PLLC, Providence Hill Farm, LLC, Providence Hill Farm Sporting Club, LLC, and Taggart, Rimes & Graham, PLLC were dismissed with prejudice.[6]  As a result of the order

_____

[6]The agreed order noted that it was agreed to by "Livingston Holdings, LLC, and to the extent applicable, Chestnut Hill, LLC, and Chestnut Developers, LLC[.]" The Landrums

of disqualification, on May 6, 2021, the chancellor granted summary judgment in favor of Defendants Heritage Real Estate, LLC; MS Ventures, LLC; Livingston Township Fund Two, LLC; Livingston Cottages, LLC; and Livingston Township Management, LLC.

¶24. Then, on May 18, 2021, a motion for judgment on the pleadings was filed by Defendants B&S; Los Robles Investment Properties, LLC; Los Robles MS Investment Properties, LLC; Michael C. Bollenbacher; Robert Yamamoto; Michael Sharpe; Marna Sharpe; and Genysys MS Investment Properties, LLC (collectively, "Defendants"). The motion requested dismissal of Counts III (usurpation of corporate opportunities), VI (tortious interference), VII (breach of duty of good faith and fair dealing), VIII (breach of contract), IX (tortious interference with prospective contractual relations), X (unjust enrichment), XI (constructive trust), XII (misappropriation of corporate funds), and XIII (accounting). On August 11, 2021, the chancellor granted the motion. The chancellor then ordered that the parties would go to trial on the remaining claims, which were asserted by David and Jill in their individual capacity and included: Count II (breach of fiduciary duty), Count IV (negligent omission and misstatement of material facts), Count V (civil conspiracy, aiding and abetting), Count XIV (fraud and fraudulent concealment), Count XVII (actual damages) and Count XVIII (punitive damages). Defendants' counterclaims also remained viable claims.

¶25. A bench trial of the remaining claims was held on September 13 to 16, 2021, and on January 19 to 21, 2022. The chancellor then entered a final judgment that denied David and

---

contend that they never agreed to dismiss these parties.

Jill any relief, denied any remaining claims and denied the Defendants' counterclaims. David and Jill now appeal. Defendants cross-appeal.

## ISSUES PRESENTED

¶26. On appeal, David and Jill's arguments can be summarized as follows:

I.      Whether the chancellor erred by finding that Jill lacked standing to maintain the derivative lawsuit.

II.     Whether the chancellor erred by denying Jill's Mississippi Rule of Civil Procedure 52(a) motion.

III.    Whether the chancellor erred by denying Jill's Mississippi Rule of Civil Procedure 54(b) motion.

IV.    Whether the chancellor erred by finding no breach of fiduciary duty on behalf of Defendants.

V.     Whether the chancellor erred by finding no negligent omission, misstatement of material facts, civil conspiracy, aiding and abetting, fraud, or fraudulent concealment on the part of Defendants.

VI.    Whether the chancellor erred by excluding the Landrums' expert witness.

The Defendants arguments on cross-appeal are best summarized as:

VII.   Whether the chancellor erred in the interpretation of the Second MOU.

VIII.  Whether the chancellor erred by denying attorneys' fees.

## DISCUSSION

**I.      Whether the chancellor erred by finding that Jill lacked standing to maintain the derivative lawsuit.**

*A.     Standard of Review*

11

¶27. This Court has stated that "appellate review of a dismissal of a shareholder derivative suit is a mixed question of law and fact." **Burgess v. Patterson**, 188 So. 3d 537, 547 (Miss. 2016). "This Court has held that proper review of mixed questions of law and fact require that the trial court's 'factual findings [be] reviewed for clear error and [that] its interpretation of the law [be] reviewed de novo.'" **Id.** (alterations in original) (quoting **Hewes v. Langston**, 853 So. 2d 1237, 1241 (Miss. 2003)).

¶28. The Mississippi Limited Liability Company Act provides that "[a] member or an owner of a financial interest may bring an action in chancery court in the right of a limited liability company to recover a judgment in its favor[.]" Miss. Code Ann. § 79-29-1101 (Rev. 2013). In order to bring a derivative action under Section 79-29-1101, the plaintiff must be a proper plaintiff under Mississippi Code Section 79-29-1103, which states in relevant part:

> A plaintiff may not commence or maintain a derivative proceeding unless the plaintiff *fairly and adequately represents the interests of the limited liability company* in enforcing the right of the limited liability company.

Miss. Code Ann. § 79-29-1103 (Rev. 2013) (emphasis added).

¶29. The chancellor was required to decide the legal issue of standing by making the underlying factual determinations as to whether Jill "fairly and adequately" represented the interests of the company. § 79-29-1103. Although B&S's motion was for disqualification of Jill as a derivative plaintiff rather than dismissal of the claim (which was granted later), the review is the same. Further, as Jill is the only member of the derivative class, it is tantamount to a motion to dismiss. Accordingly, this Court reviews the chancellor's ruling on the motion to disqualify under a mixed standard of review.

12

## B. Chancellor's Findings and Applicable Caselaw

¶30. In making its finding, the trial court considered a case from the United States Court of Appeals for the Sixth Circuit, *Davis v. Comed, Inc.*, 619 F.2d 588 (6th Cir. 1980). *Davis* was "a complex shareholder's derivative action[.]" *Id.* at 589. The court in *Davis* considered Federal Rule of Civil Procedure 23.1, which states that a "derivative action may not be maintained if it appears that the plaintiff does not *fairly and adequately represent the interests* of shareholders or members who are similarly situated in enforcing the right of a corporation or association." F.R.C.P. 23.1. The court in *Davis* found the following eight factors could be gleaned from caselaw to aid in the determination of whether a shareholder could fairly and adequately represent the interests of the corporation:

> [(1)] economic antagonisms between representative and class; [(2)] the remedy sought by plaintiff in the derivative action; [(3)] indications that the named plaintiff was not the driving force behind the litigation; [(4)] plaintiff's unfamiliarity with the litigation; [(5)] other litigation pending between the plaintiff and defendants; [(6)] the relative magnitude of plaintiff's personal interests as compared to his interest in the derivative action itself; [(7)] plaintiff's vindictiveness toward the defendants; and, finally, [(8)] the degree of support plaintiff was receiving from the shareholders he purported to represent.

*Id.* at 593-94.

¶31. In this case, the chancellor made the following finding:

> Mississippi Code 79-29-1103 requires the proper plaintiff derivative action be a member at the time any action is brought. And fairly and adequately represents the interests of the LLC and rights of said entity.
>
> The Court heard arguments as it pertains to that analysis, the *Davis* opinion, as outlined in the eloquent and illuminating oral arguments here today. The Court means that.

13

The Court would specifically reference certain aspects of said case, plaintiff's vindictiveness towards the defendant, relative magnitude of the plaintiff's personal interests as compared to the interests in the derivative action itself as being particularly controlling to this Court.

The Court will not fully expound upon the voluminous history of the parties, but to suffice it to say that Factor Number 7, as well as also certain economic antagonisms that are on full display and argued here today; but in particular, the fact that this is indeed in essence a personal damages suit.

For those foregoing reasons, the Court would indeed grant the Motion to Disqualify Jill Landrum as a derivative plaintiff and the Court so orders.

This finding was followed by a written order granting the motion to disqualify that offered no further analysis.

¶32. The Landrums argue that this Court has not adopted the eight-factor test and that *Davis* is factually distinguishable from this case. The Landrums submit, however, that if this Court decides to consider *Davis*, the Court should also consider the Virginia Supreme Court's finding in *Cattano v. Bragg*, 727 S.E.2d 625 (Va. 2012).

¶33. In *Cattano*, the court addressed the applicability of the *Davis* factors to a derivative standing challenge between the only two shareholders of Cattano Law Firm, P.C.—John Cattano and Caroline Bragg. *Id.* at 626. Bragg had filed suit against Cattano, both individually and as a derivative plaintiff, after Cattano refused to open the financial records for Bragg to inspect. *Id.* The trial court denied both Cattano's demurrer and a later filed motion to strike on the issue of Bragg's derivative standing. *Id.* at 627. The case proceeded to trial, and, after trial, Cattano appealed multiple issues, including the denial of his pretrial motion to strike. *Id.* at 628.

¶34. The Court applied Virginia Code Section 13.1-672.1(A), which is similar to Section 79-29-1103. Section 13.1-672.1(A) required that a shareholder "[f]airly and adequately represent[s] the interests of the corporation in enforcing the right of the corporation." *Id.* at 628 (first alteration in original) (internal quotation marks omitted) (quoting Va. Code Ann. § 13.1-672.1 (A)). The court reasoned that although it had previously "held that the widely accepted *Davis* factors were the primary relevant considerations[,]" in the case of a closely held corporation, "we must look beyond the mere presence of economic and emotional conflict, placing more emphasis on whether the totality of the circumstances suggest that the plaintiff will vigorously pursue the suit and that the remedy sought is in the interest of the corporation." *Id.* at 628, 629 (citing *Jennings v. Kay Jennings Fam. Ltd. P'ship*, 659 S.E. 2d 283, 288 (Va. 2008) (in which the Virginia Supreme Court adopted the *Davis* factors)). The court found that under the totality of the circumstances, Bragg had derivative standing. *Id.* at 630.

¶35. Based on *Cattano*, the Landrums contend that the chancellor's disqualification of Jill as a derivative plaintiff violated her rights under Section 79-29-1103. According to Jill, arguments alleging "animosity, vindictiveness, and personal interests" in a closely held corporation should have no effect on her statutory right to bring a derivative suit. Further, Jill contends that the chancellor's decision was based on nonbinding caselaw and false statements.

¶36. Defendants present the *Davis* factors and state that based on *Jennings*, this Court should also consider the totality of the circumstances when determining whether a plaintiff

15

is the proper person to bring a derivative suit. *Jennings*, 659 S.E.2d at 288 ("These factors, however, are not exclusive and must be considered in the totality of the circumstances found in each case."). Defendants argue that under the totality of the circumstances, the chancellor's decision to disqualify Jill as a derivative plaintiff should be affirmed.

¶37. While *Davis* dealt with a derivative shareholder's claim for a corporation, we find these factors are relevant to a derivative shareholder's claim for a limited liability company under Mississippi law. As our Court of Appeals has noted, corporations and LLCs may be similarly treated under the law in certain circumstances. *See Blanton v. Prins*, 938 So. 2d 847, 852 (Miss. Ct. App. 2005) (applying to an LLC the rule that a corporate stockholder may not bring a derivative action in his own name). Further, the *Davis* factors have been applied by courts for aid in a determination of whether a plaintiff can fairly and adequately represent an entity in a derivative action, which is Mississippi's statutory standard.

¶38. We recognize that there are differences in the language of Section 79-29-1103 and Federal Rule of Civil Procedure 23.1; the first considers the relationship of the representative and the entity, while the second considers the relationship of the representative and similarly situated shareholders. Other jurisdictions, while noting the distinction, have nevertheless found the two standards to create virtually the same requirements. *Cattano*, 727 S.E.2d at 628 n.2 ("We have previously noted the linguistic distinction but found the Virginia statute to be 'substantially similar.'" (quoting *Jennings*, 659 S.E.2d at 288 n.3)); *see Read v. Read*, 556 N.W.2d 768, 771 (Wis. Ct. App. 1996); *see also Angel Invs., LLC v. Garrity*, 216 P.3d 944, 951-52 (Ut. 2009) (finding the requirement that a derivative plaintiff fairly and

16

adequately represent the corporation is inherent in Utah's requirement that the shareholder fairly and adequately represent similarly situated shareholders).

¶39. Further, other jurisdictions consider animosity and vindictiveness as factors when determining if a plaintiff has derivative standing in a closely held corporation. *Smith v. Ayres*, 977 F.2d 946, 949 (5th Cir. 1992); *Boathouse at Breach Inlet, LLC, ex rel. Stoney v. Stoney*, 900 S.E.2d 483, 491-92 (S.C. Ct. App. 2024); *Tufo v. Tufo*, 196 N.E.3d 58, 73-74 (Ill. App. Ct. 2021).[7] Justice Griffis, in his dissent, does not present any Mississippi caselaw that would support a finding that the chancellor should be prohibited from considering animosity or vindictiveness as factors for consideration on derivative standing. He merely submits his opinion. We find the chancellor is certainly in the best position to decide the impact of a plaintiff's personal interest on their ability to fairly and adequately represent the entity.

¶40. We do not, however, adopt the *Davis* factors as an *exclusive* test. The parties, and this Court, agree that derivative standing should be considered in light of the totality of the circumstances in each case, particularly when dealing with a closely held corporation or entity.[8] *Jennings*, 659 S.E.2d at 288; *Cattano*, 727 S.E.2d at 629. We do specifically reject the Landrums' claim that arguments alleging "animosity, vindictiveness, and personal interests" in a closely held corporation should have no bearing on her statutory right to bring

---

[7]Some of these cases were allowed to proceed despite the presence of animosity. The trial court in our case, under a different set of facts, came to a different conclusion.

[8]This Court has defined a close corporation as "a business entity with few shareholders, the shares of which are not publicly traded." *Fought v. Morris*, 543 So. 2d 167, 169 (Miss. 1989).

a derivative suit. They are factors subject to consideration under a totality of the circumstances standard.

¶41. Nevertheless, the fact that the trial judge relied heavily, if not solely, on the **Davis** factors, is not improper and does not undermine his decision. *See Davis*, 619 F.2d at 593-94. It is not a scorecard. The trial judge is perfectly capable of determining what criteria are most important in an individual case and relying on those criteria in its ruling. It does not mean that the chancellor did not consider the totality of the circumstances, as well as evidence supporting those factors, nor does it mean that his specific findings are incorrect or unsupported by law. On the contrary, the record, which includes a multitude of evidence, documents as well as prior court decisions on the issues in dispute, combined with the chancellor's opinion, clearly show that he considered the totality of the circumstances.

### C. *Supporting Evidence*

¶42. The chancellor correctly found that Jill Landrum could not "fairly and adequately" represent the interest of the limited liability company. §79-29-1103. The chancellor's disqualification of Jill was based on her vindictiveness, the magnitude of her personal interest as compared to the interest in the derivative action, economic antagonisms and his determination that the suit was in essence a personal damages suit. We find that there was sufficient and adequate evidence presented at the hearing and appearing in the pleadings to support the chancellor's decision. Defendants presented multiple arguments and exhibits to support their position that Jill could not represent the company.

¶43. Defendants argued that Jill cannot fairly represent the interests of Livingston while also being in breach of the Second MOU. Defendants claimed that Jill's failure to pay the $14,000 monthly obligation under the Second MOU puts her in direct economic antagonism with Livingston members who are paying. A copy of the Second MOU was introduced as an exhibit. An affidavit from Bollenbacher was attached to the motion to disqualify swearing that as of December 2018, Jill had a deficit of $168,000 in capital contributions.

¶44. Jill argues that the consequences for nonpayment under the Second MOU are contemplated in the agreement. Any failure to pay on her part, she contends, has no impact on her ability to bring a derivative standing action. Jill further alleged that the tax returns "presently show Jill with a positive capital account in excess of $250,000.00 and B&S with a capital account negative by over $1,250,000." Jill argues that it is "disingenuous for B&S to claim Jill lacks derivative standing for failure to make monthly contributions when B&S's own records show they failed to do the same." This argument will be addressed by the Court with regard to Defendants' counterclaim. Importantly, here, however, Jill does not dispute that she has stopped making her monthly payments under the Second MOU.

¶45. Defendants argued that Jill was using the derivative action to gain control of Livingston. Cascade invoices sent to Livingston were introduced with line items for time spent discussing with David a buyout of Bollenbacher and Michael. A copy of an email dated December 9, 2017, from Jill to Michael and Marna was attached to B&S's Motion to Disqualify in which Jill presented an offer to buy out Michael and Marna's interests. The terms of the offer were that Michael and Marna would surrender their interests in B&S

19

Holdings and another entity, pay Calvert $350,000 in cash and Calvert would use the funds to release them from a personal guarantee. B&S argues that these documents prove that Jill is attempting to gain control of Livingston without having to pay.

¶46. Jill contends that the offer was "an open and transparent proposed buyout among members of a limited liability company." Jill contends that her offer should not impact her statutory rights to bring a derivative suit. Instead, Jill argues that it is B&S who used the Second MOU to "surreptitiously gain control of Livingston." Jill states she would never have agreed to transfer any ownership interest to Bollenbacher, and if she had known of Marna's intent to sell to Bollenbacher, she would not have agreed to the Second MOU.

¶47. B&S argued that the Landrums' adverse position to Livingston, Chestnut and the Sharpes in the federal litigation is further evidence that the Landrums do not adequately represent the interests of the company. Defendants further argue the significance of Jill's voluntarily testifying against Livingston for Cascade in the federal court without being subpoenaed. A copy of the federal court's findings of fact and conclusions of law along with the judgment against David were introduced into evidence.

¶48. Jill states that she was not a party in the lawsuit. Jill nevertheless argues that "a difference of opinion as [to] the validity or invalidity of claims or defenses in legal proceedings is not sufficient justification to deprive Jill of her statutory rights to a derivative action."

¶49. Defendants argued that the filing of the lis pendens was vindictive. At the May 2020 hearing during argument on the Motion to Disqualify, the Landrums' counsel argued on this

20

topic that "[t]hey were fixing to auction off everything you see there. And they are telling us that we have no right to any of that whatsoever, in spite of the Joint Venture Agreement." The chancellor interrupted and asked, "[s]o you are not disputing vindictiveness? You are just saying you have a good reason to be vindictive?" Counsel responded "Well what were we supposed to do?" Counsel later argued, however, that Jill was not vindictive and that there was no economic antagonism.

¶50. Jill contends that the filing of the lis pendens was not vindictive but was done because she had learned that B&S had set an auction for June 11, 2019, to sell almost all the property owned by Livingston Holdings and its subsidiaries. The chancellor, however, ruled on the lis pendens and found that "the Lis Pendens that is the subject to this motion was improper, and in all likelihood vindictive in nature with no basis in the law."

¶51. B&S also argued that during the Cascade litigation, David and Jill executed a modification to the deed of trust in favor of Cascade "with the intent to benefit Cascade to the detriment of Livingston." B&S argues that David had no authority to sign the modification and that it resulted in an increase of the debt on the Cascade note from $951,147 to $1,347,361.

¶52. On appeal, the Landrums argue that David executed the legal document, not Jill, so her rights to bring a derivative action should not be impacted. Further, the Landrums argue that the modification was necessary "to correct a scrivener's error" that incorrectly listed Cascade as the debtor and Chestnut Developers as the secured party. The Landrums also admit that the note modification included additional indebtedness under a forbearance

agreement but that it also allowed Livingston and its subsidiaries an additional two years of "non-payment on the indebtedness." The Landrums contend that the forbearance agreement with Calvert, which was signed by B&S and Michael, specifically required modification of the deed of trust to raise the amount of indebtedness.

¶53. The factual arguments of the parties continue; however, it is unnecessary to regurgitate all of the supporting evidence presented when the documents and other testimony in the record clearly support a finding that Jill acted in her own interests, interests detrimental to the corporate entity. The chancellor heard these arguments and more. The chancellor was in the best position to weigh the evidence as well as judge the credibility of the witnesses. We affirm his finding that this is "in essence a personal damages suit." Jill's loss of control of the company does not support a claim that the company has suffered an injury. Further, Jill cannot use the company in an attempt to gain standing for personal damages claims. The chancellor was in the best position to resolve each of these factual scenarios, and we give deference to his finding. *Frazier v. Shackelford (In re Est. of Carter)*, 912 So. 2d 138, 143 (Miss. 2005). The record supports the chancellor's decision, and we affirm.

> **II.**     **Whether the chancellor erred by denying Jill's Mississippi Rule of Civil Procedure 52(a) motion.**

¶54. This Court reviews the chancellor's denial of the Rule 52(a) motion for abuse of discretion. *Tricon Metals & Servs., Inc. v. Topp*, 516 So. 2d 236, 239 (Miss. 1987). Mississippi Rule of Civil Procedure 52(a) states: "[i]n all actions tried upon the facts without a jury the court may, and shall upon the request of any party to the suit or when required by these rules, find the facts specially and state separately its conclusions of law thereon and

judgment shall be entered accordingly." The chancellor denied the Landrums' request, stating that he had already made sufficient findings of facts and conclusions of law.

¶55. The Landrums argue that it was error for the trial court to deny their timely filed motion for findings of facts because they were unable to "ascertain why the trial court determined that Jill lacked the requisite standing based on a non-binding eight (8) factor analysis that was not fully applied and not supported by the facts[.]"

¶56. Further, the Landrums argue that Rule 52 uses mandatory language "shall" requiring the court to make findings at their request. The Landrums contend this argument is further supported by the advisory committee notes on Rule 52. The relevant portion of the notes states that

> "In cases of any significant complexity the word 'may' in Rule 52(a) should be construed to read 'generally should.' In other words, in cases of any complexity, tried upon the facts without a jury, the Court generally should find the facts specifically and state its conclusions of law thereon."

M.R.C.P. 52 advisory comm. n. (quoting *Topp*, 516 So. 2d at 239). The Landrums contend that this case presents the requisite complexity.

¶57. The Landrums also rely on Mississippi Uniform Chancery Court Rule 4.01, which stated that "[i]n all actions where it is required or requested, pursuant to M.R.C.P. 52, the Chancellor shall find the facts specially and state separately his conclusions of law thereon."[9] The Landrums argue that "shall" as used in this rule "should be afforded its plain meaning;

---

[9]This is the 2020 version of Uniform Chancery Court Rule 4.01, which applied at the time of the filing of the motion.

23

as such, the trial court had no discretion in this regard" and was required to making findings of fact.

¶58.    We find that the chancellor was not required to make specific findings of fact or conclusions of law.  Mississippi Rule of Civil Procedure 52(a) applies in "all actions *tried upon the facts* without a jury . . . ."  The May 2020 hearing on the motion to disqualify the Landrums as derivative plaintiffs was not a trial upon the facts and does not fall within the ambit of Rule 52.  This Court has previously limited the application of Rule 52 in the context of a motion for summary judgment, and we find that same logic applies here.  *Harmon v. Regions Bank*, 961 So. 2d 693, 700 (Miss. 2007).  In *Harmon*, James and Martha Harmon argued on appeal that the trial court erred by denying their motion for Rule 52 findings of fact.  *Id.*  This Court stated that "[e]ven though evidence may be received by way of sworn affidavits, deposition testimony, and other such evidence, a Rule 56 summary judgment hearing is not an action 'tried upon the facts without a jury' so as to trigger Rule 52 applicability."  *Id.*  The Court noted however that the trial court had made findings in the transcript that were sufficient in that case.  *Id.*

¶59.    We find the same in this case.  The chancellor did not abuse his discretion by denying the Landrums' Rule 52 motion.  The hearing on the motion to disqualify Jill as a derivative plaintiff was not a trial on the facts and did not trigger the applicability of Rule 52.  Further, because Rule 4.01 by its terms only applies when Rule 52 applies, the Landrums' argument that Rule 4.01 also requires findings of fact is incorrect.  Finally, just as in *Harmon*, the

24

findings in the transcript as well as the record as a whole clearly and sufficiently state the chancellor's findings.

> ### III. Whether the chancellor erred by denying Jill's Mississippi Rule of Civil Procedure 54(b) motion.

¶60. We review the chancellor's denial of the Rule 54(b) motion for abuse of discretion. *Cox v. Howard, Weil, Labouisse, Friedrichs, Inc.*, 512 So. 2d 897, 900 (Miss. 1987). The relevant portion of the rule states:

> When more than one claim for relief is presented in an action, whether as a claim, counter-claim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an expressed determination that there is no just reason for delay and upon an expressed direction for the entry of the judgment.

M.R.C.P. 54(b). "In complex litigation involving multiple claims or multiple parties, or both, Rule 54(b) is helpful because it allows judges to efficiently and fairly resolve separable claims before protracted litigation is finally resolved." *Cox*, 512 So. 2d at 900. This Court has cautioned, however, that "Rule 54(b) judgments must be reserved for rare and special occasions" and that, "unless the reason the judgment was granted is clear from the record, we will not search for a justification, but will vacate the appeal." *Id.* at 900, 901.

¶61. The Landrums requested Rule 54(b) certification of the chancellor's order disqualifying her as derivative plaintiff. The Landrums argue that the denial of the Rule 54(b) motion "deprived Jill of her rights as a member of Livingston, highly prejudiced Jill, caused harm to Livingston, and potentially resulted in all parties incurring additional fees and costs should this Court reverse[.]" These statements are conclusory. The Landrums produce no

proof that Livingston was harmed or prejudiced. Instead, the Landrums merely point out that certain claims and parties were dismissed as a result of Jill's loss of derivative standing.

¶62. The operative word in the rule is "may." The chancellor was only required to grant the Rule 54 motion if he thought that "the remainder of the case is going to be inordinately delayed, and it would be especially inequitable to require a party to wait until the entire case is tried before permitting him to appeal." *Cox*, 512 So. 2d at 900. We find that the Landrums have failed to show that the chancellor abused his discretion by denying the Rule 54 motion. The chancellor's decision is affirmed. Additionally, the issue is moot because the Landrums have now had the opportunity to present her arguments on appeal.

## IV. Whether the chancellor erred by finding no breach of fiduciary duty on behalf of Defendants.

¶63. Whether a fiduciary duty exists is a question of fact. *Lowery v. Guar. Bank & Tr. Co.*, 592 So. 2d 79, 85 (Miss. 1991). This Court reviews the factual findings of a chancellor for abuse of discretion. *Bluewater Logistics, LLC v. Williford*, 55 So. 3d 148, 157 (Miss. 2011). "This Court will reverse a chancellor only if he or she commits manifest error." *Mize v. Westbrook Constr. Co. of Oxford, LLC*, 146 So. 3d 344, 348 (Miss. 2014) (citing *Ferrara v. Walters*, 919 So. 2d 876, 880 (Miss. 2005)). "The chancellor's decision must be upheld unless it is found to be contrary to the weight of the evidence or is manifestly wrong." *Id.* (citing *Ferrara*, 919 So. 2d at 881).

¶64. It was the Landrums' burden to prove that a fiduciary duty existed. *AmSouth Bank v. Gupta*, 838 So. 2d 205, 216 (Miss. 2002) (citing *Smith v. Franklin Custodian Funds, Inc.*, 726 So. 2d 144, 150 (Miss. 1998)). The Landrums asserted in the trial court that "this case

26

involves individuals with long and personal relationships, a development spanning more than a decade, the joint venture, and the existence of multiple entities and transactions, including multiple contracts by and among the parties." The Landrums represent that the closely held companies managed and owned by individuals further supports their contention that a fiduciary duty existed as a matter of law.

¶65. The Landrums base their argument on *Fought*, 543 So. 2d 167. In *Fought*, the Court, addressing a stock redemption agreement in a closely held corporation, found that "directors and other officers of a corporation, whatever their relation may be technically, occupy a fiduciary or quasi trust relation toward the corporation and the stockholders collectively[.]" *Id.* at 171-72 (quoting *Knox Glass Bottle Co. v. Underwood*, 228 Miss. 699, 89 So. 2d 799, 814 (1956)). The Court expounded further that this fiduciary duty includes "exercising the utmost good faith and loyalty in discharge of the corporate office." *Id.* at 171 (citing *Gibson v. Manuel*, 534 So. 2d 199 (Miss. 1988)).

¶66. Additionally, the Landrums point to *Robley v. Blue Cross/Blue Shield of Miss.*, 935 So. 2d 990 (Miss. 2006). In *Robley* this Court stated that "[t]raditional fiduciary relationships are found in cases of trustee and beneficiary, partners, principal and agents, guardian and ward, managing directors and corporation." *Id.* at 994 (citing *Carter Equip. Co. v. John Deere Indus. Equip. Co.*, 681 F.2d 386, 390 (5th Cir. 1982)). Further, the Court found that a fiduciary duty may be created through a contractual agreement if

> (1) the activities of the parties go beyond their operating on their own behalf, and the activities [are] for the benefit of both; (2) where the parties have a common interest and profit from the activities of the other; (3) where the parties

repose trust in one another; and (4) where one party has dominion or control over the other.

*Id.* at 995 (alteration in original) (quoting ***Univ. Nursing Assocs., PLLC v. Phillips***, 842 So. 2d 1270, 1274 (Miss. 2003)). Based on this caselaw, the Landrums argue that considering that this is a closely held entity "where individuals own and manage each entity," a fiduciary duty exists between them all.

¶67. The chancellor ruled on the breach of fiduciary duty claim in his final judgment after a trial on the merits, seemingly focusing the bulk of his analysis on whether a fiduciary duty was created under the JVA. The chancellor found that it appeared from the testimony of David, Michael, Calvert and Bollenbacher that "the parties to this development had diverging interests on how the project would proceed. The Court considers that the JVA does not provide that the parties must agree on how the project is to proceed[.]" Instead, the JVA divided management and duties among the different ownership entities. The chancellor stated that it did not "identify a fiduciary duty that was owed or violated, with respect to the agreements entered into between the parties[.]" The chancellor further concluded that "the Landrums have not identified a specific fiduciary duty owed or breached by any of the named Defendants[.]"

¶68. First, this Court agrees with the chancellor and Defendants that "David Landrum could be owed no such [fiduciary] duty because he was not a member of Livingston Holdings, LLC, nor of any other entity involved in this litigation." Any finding of a fiduciary duty must be limited to Jill. As Jill is quick to point out, she and David are not joined in all of their actions. Jill was part owner in Livingston Holdings, and Livingston was part of the JVA. David is not

28

a member of Livingston Holdings and took actions in his individual capacity or on behalf of the LLC, arguably without authority. Further, David has pointed to no basis in the law or record for how he was owed a fiduciary duty by B&S, Los Robles, Bollenbacher, Yamamoto, Genysys or the Sharpes.[10]

¶69. Jill brings a multitude of allegations here against B&S, Los Robles, Bollenbacher, Yamamoto, the Sharpes and Genysys.[11] Jill claims that this list of offenses by the Defendants is not exclusive:

> 1) entering into the Joint Venture Agreement via a non-existent entity; 2) failure to obtain funding, as required by the Joint Venture Agreement, opting instead to finance projects outside the Joint Venture Agreement; 3) taking advantage of Livingston's financial troubles with respect to the Primos property; 4) failing to honor the soft equity arrangement with respect to Fund One/ commercial properties; 5) undisclosed dealings by and among Martin and BankPlus; 6) undisclosed negotiations regarding the transfer of Marna's membership interests to Bollenbacher or an entity controlled by him; 7) developing [sic] time and resources to other real estate project[s] within Madison County, Mississippi but outside of the Town of Livingston while Bank Plus issued demand on its promissory note; 8) misrepresentations as to the need for the MOU; 10) acting against the best interests of Livingston in negotiations with Sandridge / Crosstown, including the insistence on paying non-Livingston creditors and unsecured creditors over secured creditors; 11) filing of a complaint to judicially dissolve Livingston; 12) filing of a complaint to prevent Jill from filing a derivative action; 13) removing valuable and unencumbered property from Livingston without any notice to either of the Landrums; and 14) misappropriating tax losses among the members of Livingston contrary to the operating agreement/MOU.

---

[10]David cannot use Jill as a placeholder to escape tax repercussions and still claim all benefits to a member's rights and profits. If you are going to be the puppeteer, you have to accept the consequences when the strings are cut.

[11]Defendants dispute whether Genysys is a proper party because Jill did not allege a breach of fiduciary duty as to Genysys in the trial court, so none may be raised on appeal. We find the issue moot as no fiduciary duty exists between Genysys and Jill.

¶70. Despite finding that no fiduciary duty existed, the chancellor addressed nearly all the instances the Landrums claim constituted breach of an alleged fiduciary duty. The chancellor denied relief on any other claims not addressed at the end of his final judgment. Most of the actions that allegedly constituted a breach of fiduciary duty were the same as the actions allegedly constituting negligent omission or misstatement of material fact, civil conspiracy and fraudulent misrepresentation, i.e., the Landrums' remaining claims against Defendants. As discussed below, the Landrums fail to cite authority on these claims in their brief, meaning they are procedurally barred from review on appeal. *Rex Distrib. Co., Inc. v. Anheuser-Busch, LLC*, 271 So. 3d 445, 452 (Miss. 2019). This Court will, however, review the chancellor's findings related to the breach of fiduciary duty, giving appropriate deference to the chancellor's factual determinations.

¶71. This Court finds that a fiduciary duty did exist between the parties, although not to the extent argued by Jill. We decline to accept Jill's argument that a fiduciary duty existed simply because the parties were working closely together. Instead, the Court focuses its analysis on the agreements that were entered between these parties.

¶72. Per Mississippi Code Section 79-29-123(6)(c) (Supp. 2023), a fiduciary duty existed between the members of Livingston, a member managed Mississippi LLC. The parties to the Second MOU/Operating Agreement were Jill, Marna during her ownership and then B&S. B&S brings Section 79-29-123 to this Court's attention and seems to reluctantly acknowledge that there is a fiduciary relationship between B&S and Jill.[12] B&S contends that it did not

---

[12]We do not find record evidence that B&S admitted this before the chancellor or that Section 79-29-123 was argued before the chancellor. Jill did argue, however, that there was

breach any duty to Jill and that under Mississippi Code Section 79-29-123(6)(c)(ii)(2) (Supp. 2023), it cannot be found liable for breach of fiduciary duty because in all its actions it had a good-faith reliance on the provisions of the operating agreement. Miss. Code Ann. § 79-29-123(6)(c)(ii)(2) (Supp. 2023) (stating that a member shall not be liable to the company or to another member "[f]or breach of fiduciary duty for the member's good faith reliance on the provisions of the operating agreement."). Accordingly, a fiduciary duty existed between the members of Livingston under the terms of the Second MOU and the Operating Agreement.

¶73.    Two of the allegations brought by Jill against B&S specifically were that it allowed Chestnut Developers to distribute unencumbered property valued at more than $1,500,000 directly to Marna and that B&S has "allocated millions of dollars in tax losses away from Jill and for the benefit of B&S," which is directly contrary to the governing documents. On these two counts, the Landrums point out, the chancellor's final judgment was silent, although they were argued before the court at trial.

¶74.    Because we find that the chancellor abused his discretion by failing to recognize a fiduciary duty existed between Jill and B&S as members in Livingston Holdings, we reverse the chancellor's finding that no duty existed as to B&S only. Because the chancellor incorrectly found no duty existed and did not address these allegations by Jill, we remand this narrow issue to the chancellor for factual findings.

¶75.    Jill alleged that Marna and Bollenbacher breached their fiduciary duty by making misrepresentations as to the need for a Second MOU and as to the Cottages construction

---

a fiduciary duty between the members of Livingston.

31

commencing upon execution of the Second MOU. Jill's argument was that Marna committed a civil conspiracy with her attorneys and Bollenbacher to convince Jill to concede a 1 percent interest in Livingston to Marna so that construction on the Cottages could commence. Jill claims she did not know that Marna would then transfer a majority interest in Livingston to Bollenbacher, to which Jill would never have agreed.

¶76. The chancellor found this claim to be without merit and noted that he had received "inconclusive evidence regarding the existence of any scheme by and between the Sharpes, Michael Bollenbacher, and attorney Jamie Planck Martin to mislead the Landrums regarding ownership or management of the property." Further, the chancellor found that "Jill later approved the assignment of Marna's interest in B&S in November 2014."[13] The chancellor found that the Landrums failed to show that Jill has been harmed by B&S's subsequent majority interest/reliance on alleged misrepresentations. Instead, the chancellor noted that the record evidences that the "obligations of outstanding indebtedness of the Livingston project may have decreased due to the change in majority ownership."

¶77. This finding is supported by the record. This is the only claim that could be considered against Marna directly as a member of Livingston. Although the chancellor erred by failing to recognize that a fiduciary duty existed between Marna and Jill, the chancellor was correct in finding no breach of an alleged duty occurred.

¶78. A second basis for a finding of fiduciary duty was presented by the parties through the JVA. "Under Mississippi law, a 'joint venture' is an enterprise engaged in by several persons

---

[13]The record contains a copy of the assignment. Under a bold heading of "Consented To By:" is Jill signature. There can be no dispute that Jill consented to the assignment.

jointly to carry out a single business enterprise for profit, for which purpose the persons involved combine their property, money, efforts, skill and knowledge." *Davis v. Noblitt & Capers Elec. Co., Inc.*, 594 So. 2d 610, 613 (Miss. 1992) (citing *Sample v. Romine*, 193 Miss. 706, 8 So. 2d 257 (1942)). In a joint venture, "each venturer has the power to bind the other adventurers and subject all to liabilities to third persons in matters strictly within the scope of the joint enterprise." *Carmichael v. Agur Realty Co., Inc.*, 574 So. 2d 603, 611 (Miss. 1990) (citing *Jim Murphy & Assocs., Inc. v. LeBleu*, 511 So. 2d 886, 891-92 (Miss. 1987)).

¶79.    This Court has previously stated that "[a] partnership and joint venture are virtually the same, except that a joint venture is thought to have more limited and circumscribed boundaries." *Noblitt*, 594 So. 2d at 613 (citing *Carmichael*, 574 So. 2d at 610). As this Court has stated, a fiduciary duty exists among partners in a partnership, and it has also stated that a fiduciary duty exists among joint venturers. *McCartney v. McKendrick*, 226 Miss. 562, 85 So. 2d 164, 168 (1956) ("The relationship between the joint adventurers is fiduciary in character and imposes upon all the participants the utmost good faith, fairness, and honesty in their dealings with each other as respects the enterprise." (internal quotation mark omitted) (quoting *Sample*, 8 So. 2d at 262)).

¶80.    We find that a fiduciary duty existed between the entities in the JVA, Livingston and Los Robles. Jill, however, fails to prove how the fiduciary duty was owed to her personally as a minority member of Livingston. Jill argues that because Los Robles did not exist as a properly formed entity, then Los Robles by default was actually a partnership between

33

Bollenbacher and Yamamoto. Even in this hypothetical, however, Bollenbacher and Yamamoto would owe a fiduciary duty to Livingston, not Livingston's members individually. Because Jill cannot "fairly and adequately" represent the interests of Livingston, this Court finds that Jill cannot argue that Los Robles breached the fiduciary duty owed to Livingston. § 79-29-1103. Neither can Jill argue that Los Robles breached a duty that it never owed to Jill. *Lowery*, 592 So. 2d at 83 ("A fiduciary duty must exist before a breach of the duty can occur.").

¶81. We affirm the chancellor's finding that no fiduciary duty was owed to Jill under the JVA. Nevertheless, the chancellor continued by addressing each of the alleged instances of breach of fiduciary duty raised by the Landrums in light of an alleged fiduciary duty, or under the other counts of fraud, misrepresentation and conspiracy, i.e., breach of fiduciary duty. The chancellor specifically found that it appeared from the testimony of David, Michael, Calvert and Bollenbacher that "the parties to this development had diverging interests on how the project would proceed. The Court considers that the JVA does not provide that the parties must agree on how the project is to proceed[.]" Disagreements among joint venturers is not enough to prove a breach of fiduciary duty. The chancellor did not abuse his discretion by making these findings, and many of these factual findings are barred from this Court's review on appeal for failure to cite authority. As stated, however, we partially reverse the chancellor's finding and remand this issue to the chancellor for factual determinations as to whether the fiduciary duty between B&S and Jill as members of Livingston was breached by the two occurrences that the chancellor failed to address in his final opinion.

34

**V.**    **Whether the chancellor erred by finding no negligent omission, misstatement of material facts, civil conspiracy, aiding and abetting, fraud or fraudulent concealment on the part of Defendants.**

¶82.    We decline to address these issues because the Landrums failed to cite any authority in their brief. Mississippi Rule of Appellate Procedure 28(a)(7) requires that an appellant in their arguments in their brief "shall contain the contentions of appellant with respect to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes and parts of the record relied on." M.R.A.P. 28(a)(7). This Court has stated that "[f]ailure to cite legal authority in support of an issue is a procedural bar on appeal." *Rex Distrib. Co., Inc.*, 271 So. 3d at 452 (alteration in original) (internal quotation marks omitted) (quoting *Webb v. DeSoto Cnty.*, 843 So. 2d 682, 685 (Miss. 2003)).

¶83.    Only after Defendants filed their responsive brief that requested this Court bar these issues from review did the Landrums present support for their argument in the reply. The support given merely states the elements of the alleged claims with no actual application to the issues. Accordingly, this Court finds these issued are barred and declines to review them.

**VI.**    **Whether the chancellor erred by excluding the Landrums' expert witness.**

¶84.    "[T]he admission of expert testimony is within the sound discretion of the trial judge. . . . Therefore, the decision of the trial judge will stand 'unless we conclude that the discretion was arbitrary and clearly erroneous, amounting to an abuse of discretion.'" *Kilhullen v. Kan. City S. Ry.*, 8 So. 3d 168, 172 (Miss. 2009) (alterations in original) (internal quotation marks omitted) (quoting *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 34 (Miss. 2003)). Lastly, the Landrums argue that the chancellor erred by excluding the testimony of Scott

Womack, their expert witness, who would testify on lost-profits/damages for the Cottages development. The chancellor excluded the expert testimony "as to any lost profits as to a yet-to-be-established entity or business," i.e., the Cottages, finding that it would be speculative.

¶85. The Landrums argue that although the Cottages had not been formed, the entities such as Livingston, Chestnut Developers and the Cottages, LLC (an entity that would be used to create the Cottages), were in existence. The Landrums argue that the joint venture had site and subdivision plans, infrastructure costs and appraisals on the prospective Cottages. The Landrums cite *Lovett v. E.L. Garner, Inc.*, for the proposition that "[t]here are no guidelines set in stone specifying the degree of certainty that we require of parties in proving loss of future profits. Indeed, the degree of proof required usually depends on the particular facts of the case." *Lovett v. E.L. Garner, Inc.*, 511 So. 2d 1346, 1353 (Miss. 1987).

¶86. Defendants submit *Webb v. Braswell*, 930 So. 2d 387 (Miss. 2006), which they claim supports the chancellor's decision. In *Webb*, this Court affirmed a trial court's exclusion of an expert witness who would testify on the "future damages resulting from unplanted crops." *Id.* at 397. The Court in *Webb* stated that

> "anticipated profits of an unestablished future business are generally too speculative for recovery, but where the business has been established, has made profits and there are definite, certain and reasonable date for their ascertainment, and such profits reasonably must have been in the contemplation of the parties at the time of the contract, they may be recovered at least for a limited reasonable future time, even though they cannot be computed with exact mathematical certainty."

*Id.* at 398 (quoting *Kaiser Invs., Inc. v. Linn Agriprises, Inc.*, 538 So. 2d 409 (Miss. 1989)).

¶87. Womack was subject to cross-examination on his experience and qualifications. Defendants argue that Womack admitted that he knew nothing about a PUD, had never done an economic damages analysis of a PUD and was not qualified to value real estate. While this does not directly show that Womack's testimony was not reliable, the trial court, acting within its discretion, found his testimony on lost profits speculative. *Moss v. Batesville Casket Co., Inc.*, 935 So. 2d 393, 404 (Miss. 2006) ("As the trial court operates as the gatekeeper as to the admissibility of expert testimony, we examine the trial court's decision under an abuse of discretion standard of review." (citing *Tunica Cnty. v. Matthews*, 926 So. 2d 209, 212-13 (Miss. 2006))).

¶88. This Court finds that the arguments by the Landrums fall short of proving that the chancellor abused his discretion by excluding the expert testimony. Accordingly, we affirm on this issue.

> **VII. Whether the chancellor erred in the interpretation of the Second MOU.**

¶89. We review the chancellor's interpretation of the Second MOU under a de novo standard. *Royer Homes of Miss., Inc. v. Chandeleur Homes, Inc.*, 857 So. 2d 748, 751 (Miss. 2003) (citing *Warwick v. Gautier Util. Dist.*, 738 So. 2d 212, 214 (Miss. 1999); *Miss. State Highway Comm'n v. Patterson Enters., Ltd.*, 627 So. 2d 261, 263 (Miss. 1993)). "First of all, it is a question of law for a court to determine whether a contract is ambiguous and, if not, enforce the contract as written." *Id.* at 751 (citing *Miss. Transp. Comm'n v. Ronald Adams Contractor, Inc.*, 753 So. 2d 1077, 1087 (Miss. 2000)). "We must look to the 'four

corners' of the contract whenever possible to determine how to interpret it" *Id.* at 752 (quoting *McKee v. McKee*, 568 So. 2d 262, 266 (Miss. 1990)).

¶90. The main purpose of the Second MOU was to equalize any disparity in capital contributions between Marna and Jill and to allow for Jill and Marna to have a mechanism to equalize the contributions going forward. As of July 24, 2014, prior to the Second MOU, Marna had a 64.2 percent membership interest, and Jill had a 35.8 percent interest. The amount of capital funds that Marna had contributed over Jill "exceeded the amount anticipated," so under the terms of the Second MOU it was treated as a loan "from Sharpe to the Company" "due and payable and accruing interest as provided in the Promissory Note." If, however, Marna again contributed more than Jill then the amount of contribution over Jill's would be added to the Note. Once the loan was paid, Marna and Jill would return to equal ownership shares. Until such point, it was agreed that Marna would have a 51 percent membership interest, and Jill would have a 49 percent membership interest.

¶91. Jill and Marna were both required to contribute $14,000 monthly to their capital accounts, which would be used for operating expenses and payment of debt obligations. The Second MOU contained Paragraph 13, which stated in relevant part:

> 13.　**Failure to Make Required Capital Contributions.**
>
> 　(a) (i) In the event that Landrum fails to make any Required Capital Contribution as provided in Section 11 and such failure is not cured within fifteen (15) days following written notice from Sharpe to Landrum of such failure. or (ii) in the event that Landrum fails for three (3) consecutive months to make the Required Capital Contribution on or before the 20th of the applicable month as provided in Section 11 and Sharpe has provided Landrum written notice thereof, then the First Landrum

38

Capital increase and any Additional Landrum Capital Increase *shall automatically and without further notice be deemed deducted from and not included in the total Landrum Capital Contributions*.

The second portion of this paragraph contained identical requirements but only as to Marna.

¶92. The memorandum then went further to include Paragraph 20, which stated:

20. **Rights and Remedies.** In the event of a default under the terms of this Agreement, the parties hereto shall have all rights and remedies available in law and in equity. In the event that any party to this Agreement is found to be in default under this Agreement, such party shall pay all responsible attorneys' fees and expenses paid by the other parties to this Agreement in connection with such default.

¶93. Livingston sought a breach of contract claim against Jill for failure to make the required monthly contributions, which it argued were in the amount of approximately $266,000. Defendants[14] raise this issue again on appeal and argue that the chancellor erred in its interpretation of the remedies under the Second MOU. Defendants claim that Jill has admitted to failing to make her required monthly contributions. Defendants are correct. Jill's counsel admitted, and Jill does not contest, that she has stopped making contributions. At the May 21, 2020, hearing, Jill's counsel stated, "We continued to make these $14,000 monthly capital contributions until such time as Jill was advised by counsel not to do so." Counsel then continued with arguments as to Jill's reasons for not making her contributions. David also, reluctantly, admitted at trial on September 15, 2021, that he and Jill had stopped paying the monthly contribution in December 2018.

---

[14] For clarity, we note that Livingston filed a brief jointly with Defendants in this case.

¶94. The chancellor found the remedy for failure to make capital contributions in Paragraph 13 was exclusive. The chancellor stated that "[s]aid exclusive remedy is a corresponding effect on said member's capital account. Therefore, there is no breach of contract entitling Livingston to any damages in this cause." The chancellor considered the "tax returns maintained by Mike [Sharpe] and Bollenbacher presently show Jill with a positive capital account in excess of $250,000.00 and B&S with a capital account negative by over $1,250,000.00." Accordingly, the chancellor found that the breach of contract claim was without merit because Jill's capital account was in the positive. Relief was denied.

¶95. Defendants argue that based on *Glantz Contracting Co. v. General Electric Co.*, 379 So. 2d 912, 917 (Miss. 1980), the chancellor erred by finding that Paragraph 13 is exclusive. In *Glantz*, the Court, in discussing whether a remedy in a contract was exclusive, reasoned that

> Had the contract mandated that GE "shall" do something, then if that was the only remedy allowed for in the contract it might be exclusive, but such is not the case presented. Courts must construe contracts so that they give effect to all provision and do not produce an unfair and unreasonable result.

*Id.* (citing *Citizens Bank v. Frazier*, 157 Miss. 298, 127 So. 716, 717 (1930)).

¶96. While use of the word "shall" in Paragraph 13 mandates what will happen automatically if there is a failure to make capital contribution, it does not mandate that Paragraph 13 is the only remedy.[15] Paragraph 13 certainly does not claim to be exclusive nor

---

[15] Further, it is arguable that Paragraph 13 is not a remedy at all but, rather, a self-executing provision of the contract making adjustments to the increases/contribution credits of the Landrums upon the Landrums' failure to make the required payments.

does it claim to limit any other recovery. The issue turns on whether there has been a default such that Paragraph 20 is triggered.

¶97. Jill contends that the Second MOU controls what happens when a member lapses on their monthly payment so there has been no breach of contract. Jill makes further arguments that are irrelevant to the contract interpretation—B&S failed to make contributions, not Jill; Bollenbacher is being selective in pursuing breach of contract claims which is a breach of fiduciary duty; Livingston is not a party to the suit, so it cannot assert a counterclaim against Jill. These arguments do not aid this Court in interpreting the plain language of the Second MOU, and we find her arguments without merit.

¶98. We find the chancellor's interpretation fails to account for the remedies provided in Paragraph 20. While Paragraph 13 requires certain actions to occur when either Jill or Marna fail to make capital contributions, we do not find that precludes Livingston from seeking damages for default under Paragraph 20. Neither paragraph claims to be exclusive, and we see no valid reason why Livingston cannot pursue the rights and remedies guaranteed by the agreement. Jill, again, cites no caselaw to support her argument that Paragraph 13 is exclusive.

¶99. We reverse and remand the breach of contract claim. Jill has admitted to actions that constitute a default under the terms of the agreement. The parties agreed that in the event of a default they would be entitled to pursue "all rights and remedies available in law and in

equity[.]" We remand this issue to the chancellor to determine if Livingston is entitled to any other rights and remedies under the law.[16]

## VIII. Whether the chancellor erred by denying attorneys' fees.

¶100. "[U]nless a statute or contract provides for imposition of attorney fees, they are not recoverable." *Century 21 Deep S. Props., Ltd. v. Corson*, 612 So. 2d 359, 375 (Miss. 1992) (citing *Grisham v. Hinton*, 490 So. 2d 1201, 1205 (Miss. 1986)). The chancellor stated that "absent an affirmative finding as to the above Counts, assessing attorney's fees would be inappropriate in this matter. As such, the parties are not entitled to attorney's fees and/or punitive damages." We find this ruling to be erroneous as to attorneys' fees.

¶101. An award of attorneys' fees was provided for discretionarily by statute, and agreed to by the parties in the Second MOU. Mississippi Code Section 79-29-1113(2) (Rev. 2013) states:

> On termination of the derivation proceeding the court may order the plaintiff to pay any defendant's reasonable expenses, including reasonable attorney's fees, incurred in defending the proceeding if it finds that the proceeding as commenced or maintained without reasonable cause or for an improper purpose.

While this statue allows the chancellor to make a discretionary ruling on whether attorneys' fees were warranted, the Second MOU is clear that in the event of a default, attorneys' fees are provided for. Attorneys' fees are provided for as noted by the use of the mandatory "shall." This Court is "obligated to enforce a contract when its terms are clear and

---

[16] Nothing in this finding prohibits Jill from presenting any applicable defense that has been properly pled but that has not already been adjudicated by the chancellor or that is otherwise deemed to be prohibited under res judicata.

unambiguous." ***Hamilton v. Hopkins***, 834 So. 2d 695, 700 (Miss. 2003) (citing ***Ivison v. Ivison***, 762 So. 2d 329, 334 (Miss. 2000)). The chancellor's decision is reversed on this issue and remanded for further proceedings on remedies and attorneys' fees.

## IX. Remaining Claims

¶102. Jamie Plack Martin, Jamie Plack Martin, PLLC, Providence Hill Farm, LLC, Providence Hill Farm Sporting Club, LLC, and Taggart Rimes & Graham PLLC, have filed briefs before this Court in this case. After Livingston Holdings was realigned, these parties were dismissed with prejudice by order on May 4, 2021. Whether the Landrums consented to an agreed order for this dismissal is disputed by the Landrums. Nevertheless, Jill points out that the "only causes of action against Martin/Taggart were derivative actions."[17]

¶103. We find, however, these parties were not listed in the Notice of Appeal and were not listed as parties on the Landrums' brief. As we affirm the chancellor's decision on Jill's derivative standing, we dismiss any appellate claims against these parties.

## CONCLUSION

¶104. We affirm the chancellor's rulings on derivative standing and the exclusion of the Landrums' expert witness. We decline to review the findings on the claims of negligent omission, misstatement of material facts, civil conspiracy, fraud and fraudulent concealment. We reverse and remand the case on the issues of remedies and attorneys' fees due the defendants under the Second MOU and alleged breach of fiduciary duty between B&S and Jill under the Second MOU related to the Chestnut Developers alleged improper distribution

---

[17]Jill argues that she requested that the chancellor allow her to change her claims to a direct action against Martin/Taggart.

43

of unencumbered property directly to Marna and the alleged improper allocation of tax losses away from Jill and for the benefit of B&S. For the reasons stated, on direct appeal, the chancellor's decision is affirmed in part and reversed and remanded in part. On cross-appeal, the chancellor's decision is reversed and remanded.

¶105. **ON DIRECT APPEAL: AFFIRMED IN PART; REVERSED AND REMANDED IN PART. ON CROSS-APPEAL: REVERSED AND REMANDED.**

**RANDOLPH, C.J., COLEMAN, MAXWELL, BEAM AND ISHEE JJ., CONCUR. KING, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, P.J. GRIFFIS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS AND KING, P.JJ.**

**KING, PRESIDING JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶106. I agree with Justice Griffis's separate opinion, but I write separately to address the holding in Part V of the majority opinion.

¶107. In Part V, the majority relies on Mississippi Rule of Appellate Procedure 28(a)(7), which provides that "[t]he argument shall contain the contentions of appellant with respect to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record relied on." M.R.A.P. 28(a)(7). The majority holds that the Landrums are absolutely required to cite legal authority in support of the issues they raise. The majority holds that because the Landrums have failed to cite any legal authority in support of the issues identified in Part V, these issues are automatically waived on appeal. That, in my opinion, is not a correct application of Rule 28(a)(7).

44

¶108. I believe that this Court, at its option, may elect not to address matters for which no authority has been cited. But I do not believe that the failure to cite authority automatically waives appellate consideration of an issue. *See Williams v. State*, 336 So. 3d 1068, 1077-79 (Miss. 2022) (King, P.J., specially concurring); *Cork v. State*, 329 So. 3d 1183, 1193-94 (Miss. 2021) (King, P.J., dissenting). To hold otherwise suggests that, from the beginning of time, every issue that could ever be raised has already been raised and that there will never be any issues that have not been previously raised and addressed. The majority seems to find that issues of first impression simply do not exist. Such a position is illogical and most unsound.

¶109. Indeed, I am compelled to note that a number of this Court's decisions are not predicated on existing authority. *See, e.g.*, *Quality Diesel Serv. v. Tiger Drilling Co.*, 190 So. 3d 860 (Miss. 2016) (deciding issue of first impression regarding statutory interpretation without relying on caselaw from this or any other jurisdiction). It would seem that this fact alone would show the folly of the majority's absolute interpretation and application of Rule 28(a)(7). I consequently do not agree with Part V of the majority opinion.

**KITCHENS, P.J., JOINS THIS OPINION.**

**GRIFFIS, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

I. *Whether Jill had standing to pursue the derivative claims.*

A. *Mississippi law governs, not federal law.*

¶110. Does Jill Landrum fairly and adequately represent the interests of Livingston Holdings, LLC, in enforcing the right of Livingston Holdings, LLC?

¶111. Mississippi Code Section 79-29-1103 governs this case, and it provides:

> In a derivative action, the plaintiff must be a member or an owner of a financial interest at the time of bringing the action and:
>
> (a) At the time of the transaction of which the plaintiff complains; or
>
> (b) The plaintiff's status as a member or an owner of a financial interest had devolved upon the plaintiff by operation of law or pursuant to the terms of an operating agreement from a person who was a member or an owner of a financial interest at the time of the transaction.
>
> A plaintiff may not commence or maintain a derivative proceeding unless the plaintiff fairly and adequately represents the interests of the limited liability company in enforcing the right of the limited liability company.

Miss. Code Ann. § 79-29-1103 (Rev. 2013).

¶112. The chancellor ruled that Jill did not fairly and adequately represent the interests of Livingston Holdings, LLC, and disqualified her as the derivative plaintiff. The order offers no detailed factual findings or legal conclusions. The chancellor cited Section 79-29-1103 and a federal court decision, *Davis v. Comed, Inc.*, 619 F.2d 588 (6th Cir. 1980), that applied Federal Rule of Civil Procedure 23.1. The chancellor then identified three factors enumerated in *Davis* as the reasons to disqualify Jill.

¶113. "The proceeds of the action belong to the corporation and it is bound by the result of the suit. *The heart of the action is the corporate claim.*" *Ross v. Bernhard*, 396 U.S. 531, 538–39, 90 S. Ct. 733, 24 L. Ed. 2d 729 (1970) (emphasis added). There is no authority in Mississippi law to disqualify a plaintiff because of their behavior, attitudes, hostility, arrogance, or intent to recover personal damages. In Mississippi, we examine claims asserted

46

in lawsuits for merit, legitimacy, and validity of the claim asserted, not for the behavior or attitude of the plaintiff.

¶114. Article 3, section 24, of the Mississippi Constitution provides that "[a]ll courts shall be open; and *every person for an injury done him* in his lands, goods, person, or reputation, *shall have remedy by due course of law*, and right and justice shall be administered without sale, denial, or delay." Miss. Const. art. 3, § 24 (emphasis added).

¶115. "[I]t is well settled that Mississippi's standing requirements are quite liberal." *Midsouth Ass'n of Indep. Schs. v. Parents for Pub. Schs.*, 384 So. 3d 1226, 1230 (Miss. 2024) (emphasis added) (quoting *Araujo v. Bryant*, 283 So. 3d 73, 77 (Miss. 2019)). This Court has also agreed and reiterated that "Mississippi's standing requirements *are very broad*." *Cascio v. Cascio Invs., LLC*, 327 So. 3d 59, 74 (Miss. 2021) (citing *Beard v. City of Ridgeland*, 245 So. 3d 380, 393 (Miss. 2018)). Thus, this Court's review of Jill's standing as a derivative plaintiff should be based on Mississippi's "quite liberal" and "very broad" standing requirements. Neither the chancellor nor the majority mention Mississippi's "quite liberal" and "very broad" standing requirements. They certainly have not applied "quite liberal" or "very broad" standing requirements in this case.

¶116. In *Mathis v. ERA Franchise Systems, Inc.*, 25 So. 3d 298, 303 (Miss. 2009) (citing *Bruno v. Southeastern Services, Inc.*, 385 So. 2d 620, 622–23 (Miss. 1980)), this Court recognized that "[t]here is little case law in Mississippi which addresses the difference between derivative and direct actions, but the general rule is that derivative actions seek

47

recovery for injuries to the corporation." The court then distinguished a derivative claim from a direct claim:

> (a) *A derivative action may be brought in the name or right of a corporation by a holder . . . to redress an injury sustained by, or enforce a duty owed to, a corporation.* An action in which the holder can prevail only by showing an injury or breach of duty to the corporation should be treated as a derivative action.

> (b) A direct action may be brought in the name and right of a holder to redress an injury sustained by, or enforce a duty owed to, the holder. An action in which the holder can prevail without showing an injury or breach of duty to the corporation should be treated as a direct action that may be maintained by the holder in an individual capacity.

*Id.* at 303 (emphasis added) (quoting *Principles of Corporate Governance* § 7.01 (Am. L. Inst. 1994), Westlaw (database updated June 2024)). The Court ruled that "in determining whether the action belongs to the corporation or the individual, the focus of the inquiry is whether the corporation or the individual suffered injury." *Id.* To make the decision of whether the claims were derivative claims and could be asserted, the Court ruled:

> Considering these principles, *we examine the claims alleged in Mathis's complaint*:

> *Count 1*: Mathis sought a declaratory judgment (a) that he could pursue any derivative claims belonging to REP as a direct action and obtain individual recovery for these claims; (b) that ERA may not enforce any rights under the personal guaranty signed by Mathis; and (c) that Mathis owns fifty percent of REP-Central and REP-Pine Belt as corporate opportunities of REP.

*Id.* (emphasis added).

¶117. The *Mathis* Court then described the thirteen additional claims that were asserted. The complaint asserted claims for breach of fiduciary duties; violations of duties of care, loyalty,

and fair dealing; usurpation of corporate opportunities; tortious interference with contractual relations; tortious interference with prospective business advantage; conspiracy; accounting; damages from any profits gained from their wrongful conduct in a constructive trust; breach of property transfer agreement and request for specific performance; equitable conversion of real property; breach of the franchise agreement; breach of loan agreements; breach of collateral agreements; and for the recovery of compensatory damages, punitive damages, and attorneys' fees. *Id.* Jill's claims here were similar to those in *Mathis*.

¶118. Then, the *Mathis* Court held that "*[h]aving reviewed the complaint*, we agree with the trial judge that all of the claims against ERA were derivative in nature." *Id.* (emphasis added). Thus, under *Mathis*, this Court implicitly ruled that to decide if derivative claims should be permitted, the trial court should begin with a review of the derivative claims asserted in the complaint. *Id.* Only after the trial court "examine[s] the claims alleged" in the complaint could the trial court decide whether the claims are derivative claims. *Id.*

¶119. Logically, the chancellor and the majority would be required to examine and review the actual derivative claims asserted in the complaint to decide, under Section 79-29-1103, if Jill "fairly and adequately represents the interests" of Livingston Holdings, LLC, or "in enforcing the right of" of Livingston Holdings, LLC.

¶120. Jill's complaint alleged the following derivative claims, by title:

Count III    Usurpation of Corporate Opportunities against B&S, Los Robles, Los Robles MS, Bollenbacher, Yamamoto, Mike, Marna, Martin, Fontaine, LTI, LTC, LTOne, LTTwo, LTM, MSV, Genysys, Draperton, Cottages, LLC, Heritage, CF, PHF, PHFSC, and John Does A through L.

49

Count VI        Tortious Interference against B&S, Los Robles, Los Robles MS, Bollenbacher, Yamamoto, Mike, Marna, Martin, Fontaine, LTI, LTC, LTOne, LTTwo, LTM, MSV, Genysys, Draperton, Cottages, LLC, Heritage, CF, PHF, and PHFSC.

Count VII      Breach of Duty of Good Faith and Fair Dealing against B&S, Los Robles, Los Robles MS, Bollenbacher, Yamamoto, Taggart, Mike, Marna, Martin, JPM, BankPlus, LGSH, Golditch, and Genysys.

Count VIII    Breach of Contract against Los Robles, Bollenbacher, Yamamoto, LGSH and Golditch.

Count IX       Tortious Interference with Prospective Contractual Relations against B&S, Los Robles, Los Robles MS, Bollenbacher, Yamamoto, Taggart, Mike, Marna, Martin, JPM, PHF, and PHFSC.

Count X         Unjust Enrichment against B&S, Los Robles, Los Robles MS, Bollenbacher, Yamamoto, Taggart, Mike, Marna, Martin, JPM, Fontaine, LTI, LTC, LTOne, LTTwo, LTM, MSV, Genysys, Draperton, Hall, Cottages, LLC, Heritage, CF, PHF, PHFSC, and John Does A through L.

Count XI       Constructive Trust against B&S, Bollenbacher, Yamamoto, Mike, Marna, Fontaine, LTI, LTC, LTOne, LTTwo, LTM, MSV, Genysys, Draperton, Hall, Cottages, LLC, Heritage, CF, PHF, PHFSC, and John Does A through L.

Count XII      Misappropriation of Corporate Funds against B&S, Bollenbacher, Yamamoto, Los Robles, Los Robles MS, Mike, Marna, Fontaine, LTI, LTC, LTOne, LTTwo, LTM, MSV, Genysys, Draperton, Hall, Cottages, LLC, Heritage, CF, and John Does A through L.

Count XIII    Accounting against B&S, Los Robles, Los Robles MS, Fontaine, LTI, LTC, LTOne, LTTwo, LTM, MSV, Genysys, Draperton, Hall, Cottages, LLC, Heritage, CF, and John Does A through L.

¶121. In the case before us now, neither the chancellor nor the majority have examined the derivative claims. Likewise, neither the chancellor nor the majority have any idea whether

50

such claims are legitimate, meritorious, legally sufficient, or would significantly increase the value or profits of Livingston Holdings, LLC.

¶122.   In *Bluewater Logistics, LLC v. Williford*, 55 So. 3d 148, 151 (2011), this Court ruled that, "[u]nder Mississippi law, every member of a member-managed LLC is entitled to participate in managing the business[,]" and that limited liability corporations with few members resemble closely held corporations.  *Id.* at 151.  Mississippi law gives Jill Landrum the right to participate in the management of Livingston Holdings and the rights of shareholders in closely held corporations.  In *Davis*, *Cattano v. Bragg*, 727 S.E.2d 625 (Va. 2012), or *Jennings v. Kay Jennings Fam. Ltd. P'ship*, 659 S.E.2d 283 (Va. 2008), there is no indication that the federal and Virginia plaintiffs had such protected rights of participation.

¶123.   Every dispute under Mississippi law between the minority and majority owners of a closely held entity *must* consider *Fought v. Morris*, 543 So. 2d 167, 171–72 (Miss. 1989), and *Knox Glass Bottle Co. v. Underwood*, 228 Miss. 699, 89 So. 2d 799, 814–15 (1956).

¶124.   In *Fought*, this Court recognized that "the distinctive characteristics and needs" of closely held corporations made them different from traditional corporations.  *Fought*, 543 So. 2d at 169.  A closely held corporation is a "business entity with few shareholders, the shares of which are not publicly traded."  *Id.*   As a result, *minority shareholders* in closely held corporations, or members of closely held limited liability companies, *are particularly vulnerable* because they usually lack the control the majority has, and there is seldom a fair market available for selling their shares.  *Id.* at 170 (citing *Orchard v. Covelli*, 590 F. Supp. 1548 (W.D. Penn. 1984), *aff'd*, 802 F.2d 448 (3d Cir. 1986)).  Thus, if a dispute arises between

51

the minority member and the majority member, it is usually the case that a "minority [member] can neither profitably leave, nor safely stay with, the [LLC]." **Fought**, 543 So. 2d at 171 (citing **Orchard**, 590 F. Supp. at 1557).

¶125. The **Fought** Court ruled:

> in a close corporation where a majority stockholder stands to benefit as a controlling stockholder, *the majority's action must be "intrinsically fair" to the minority interest.* Thus, *stockholders in close corporations must bear toward each other the same relationship of trust and confidence which prevails in partnerships, rather than resort to statutory defenses*. This holding does not mean that directors, executive officers and stockholders are not required to adhere to the corporate statutes; rather, we mean that blind adherence to corporate statutes may not be used to circumvent the corporation's by-laws, charter or various agreements, such as a stock redemption agreement, because of the "intrinsically fair" standard we here adopt today.

*Id.* at 171 (emphasis added). The Court continued:

> [D]irectors and officers of a corporation stand in a fiduciary relationship to the corporation and its stockholders. These duties include exercising the utmost good faith and loyalty in discharge of the corporate office. [In] **Knox Glass**[, the Court] set out the following rule:
>
> > Since the directors and other officers of a corporation, whatever their relation may be technically, occupy a fiduciary or quasi trust relation toward the corporation and the stockholders collectively, *it is thoroughly well settled that they cannot, either directly or indirectly, in their dealings on behalf of the corporation with others, or in any other transaction in which they are under a duty to guard the interests of the corporation, make any profit, or acquire any other personal benefit or advantage, not also enjoyed by the other stockholders, and, if they do so, they may be compelled to account therefore to the corporation in an appropriate action.*

**Fought**, 543 So. 2d at 171–72 (emphasis added) (citations omitted).

52

¶126. Under ***Fought*** and ***Knox Glass***, the majority owner of Livingston Holdings, LLC, must adhere to the principle of intrinsic fairness. This important legal principle should be applied here and guide this Court's decision of whether Jill, as a minority member of an LLC, meets the requirements of Section 79-29-1103 and has derivative standing to pursue a claim on behalf of Livingston Holdings, LLC. In ***Davis*** and the other cases cited by the majority, there is no indication that the plaintiffs had such a protected right of intrinsic fairness.

¶127. Here, neither the chancellor nor the majority have made any effort to apply relevant Mississippi law. They cite no Mississippi authority that supports the disqualification of a plaintiff because of their behavior, attitudes, hostility, arrogance, or intent to recover personal damages. In Mississippi, we examine claims asserted in lawsuits for merit, legitimacy, and validity of the claim asserted, not for the behavior or attitude of the plaintiff.

> B. Federal law in ***Davis*** and Federal Rule of Civil Procedure 23.1 are not applicable here.

> 1. ***Davis*** is based on Federal Rule of Civil Procedure 23.1(a).

¶128. The majority's decision is ultimately based on the United States Court of Appeals for the Sixth Circuit's decision in ***Davis***, 619 F.2d 588. ***Davis*** was governed by Federal Rule of Civil Procedure 23.1 and is not applicable here.

¶129. Let us compare applicable legal standards.

¶130. Under Mississippi law, the court examines whether the derivative plaintiff "fairly and adequately represents the *interests of the limited liability company* in enforcing the right of the limited liability company"— Livingston Holdings, LLC. Miss. Code Ann. § 79-29-1103 (emphasis added).

¶131. Under federal law, Federal Rule of Civil Procedure 23.1(a), the court examines whether the derivative plaintiff "fairly and adequately represent[s] the *interests of shareholders or members who are similarly situated* in enforcing the right of a corporation or association." F.R.C.P. 23(a) (emphasis added).

¶132. The chancellor and the majority blindly accept *Davis* as relevant authority and rule that the *Davis* factors may be considered in Mississippi, even though *Davis* applied a completely different legal standard. Maj. Op. ¶¶37–41. When this Court enacted the Mississippi Rules of Civil Procedure, it rejected Federal Rule of Civil Procedure 23.1. Rule 23.1 of the Mississippi Rules of Civil Procedure reads, "Derivative Actions by Shareholders [Omitted][.]"

¶133. I concede that *Davis* and the *Davis* factors make perfect sense when the court applies the federal standard and must decide between "*shareholders or members who are similarly situated*[.]" F.R.C.P. 23.1(a). When you have more than one possible plaintiff, the court should consider the behavior, attitudes, arrogance, or self interests of the various possible derivative shareholders. But it makes no sense to consider the various behaviors or attitudes when the court's test is the "interests of the limited liability company." Miss. Code Ann. § 79-29-1103.

¶134. *Davis* should be distinguished. There, the Sixth Circuit considered a challenge to the plaintiff's derivative standing. The issue there was whether Davis, the derivative plaintiff, "[']fairly and adequately represent[ed] *the interests of similarly situated shareholders* in enforcing the corporations' rights' as required by Federal Rule of Civil Procedure 23.1[.]"

54

*Davis*, 619 F.2d at 592 (emphasis added) (quoting ***Robinson v. Computer Servicenters, Inc.***,

75 F.R.D. 637, 641 (N.D. Ala. 1976)).  The Sixth Circuit defined the issue as:

> It is obvious that plaintiffs' standing to prosecute this derivative action could be challenged on the ground that Davis "does *not fairly and adequately represent the interests of similarly situated shareholders* in enforcing the corporations' rights," *as required by Federal Rule of Civil Procedure 23.1* for maintenance of a stockholder's derivative suit.
>
> Rule 23.1 is intended to make explicit that adequacy of representation is a requirement of derivative as well as class actions. As the Supreme Court stated:
>
> > " . . . a stockholder who brings suit on a cause of action derived from the corporation assumes a position, not technically as a trustee perhaps, but one of fiduciary character. *He sues, not for himself alone, but as representative of a class comprising all who are similarly situated.* The interests of all in the redress of the wrongs are taken into his hands, dependent upon his diligence, wisdom, and integrity. And while the stockholders have chosen the corporate director or manager, they have no such election as to a plaintiff who steps forward to represent them. He is a self-chosen representative and a volunteer champion. The Federal Constitution does not oblige the state to place its litigating and adjudicating processes at the disposal of such a representative, at least without imposing standards of responsibility, liability and accountability which *it considers will protect the interests he elects himself to represent*."
>
> The court in ***Roussel v. Tidelands Capital Corp.***, 438 F. Supp. 684, 688 (N.D. Ala. 1977), explained that "Rule 23.1 requires that representation appear to be both 'fair' and 'adequate'. The decisions have interpreted this to mean that a court should examine any indications *that there are extrinsic factors which 'render it likely that the representative may disregard the interests of the class members.'*" Indeed, "while a plaintiff is not necessarily disabled to bring suit simply *because some of his interests extend beyond that of the class*, *the court may take into account outside entanglements that render it likely that the representatives may disregard the interests of the other class members*."

*Davis*, 619 F.2d at 592–93 (emphasis added) (citations omitted).  The Sixth Circuit looked at

whether the plaintiff fairly and adequately ***represented the interests of similarly situated***

*shareholders*. Nothing in the language used said that the court looked at whether the derivative plaintiff fairly and adequately represented the *interests of the entity*, Comed, Inc., or C.M.S. *Id.*

¶135. The Sixth Circuit then cited and discussed a number of federal court decisions that had interpreted Rule 23.1 and held:

> The courts have examined several factors or elements in determining *whether a particular derivative plaintiff can provide the requisite fair and adequate representation*. Typically, the elements are intertwined or interrelated, and it is frequently a combination of factors which leads a court to conclude that the plaintiff does not fulfill the requirements of 23.1 (although often a strong showing of one way in which the plaintiff's interests are actually inimical to those he is supposed to represent fairly and adequately, will suffice in reaching such a conclusion). *Among the elements which the courts have evaluated in considering* **whether the derivative plaintiff meets Rule 23.1's representation requirements are***:* [1] ***economic antagonisms between representative and class****;* [2] *the remedy sought by plaintiff in the derivative action;* [3] *indications that the named plaintiff was not the driving force behind the litigation;* [4] *plaintiff's unfamiliarity with the litigation;* [5] *other litigation pending between the plaintiff and defendants;* [6] **the relative magnitude of plaintiff's personal interests as compared to his interest in the derivative action itself***;* [7] ***plaintiff's vindictiveness toward the defendants****; and, finally,* [8] *the degree of support plaintiff was receiving from the shareholders he purported to represent*.

*Davis*, 619 F.2d at 593–94 (emphasis added).

¶136. The *Davis* factors make complete sense when the court must decide who would best be the derivative plaintiff when the court considers who would "fairly and adequately represent[ed] the interests of similarly situated shareholders." F.R.C.P. 23.1. To decide among several shareholders, the court should consider the various derivative plaintiffs based on their behavior, attitudes, arrogance, or self interests. But when there is only one possible derivative plaintiff and the court must consider who represents the "interest of the limited

56

liability company," the court should not consider behavior and attitudes but instead should consider whether the derivative claims are in the best "interests of the limited liability company." Miss. Code Ann. § 79-29-1103.

¶137. *Davis* is not applicable here. *Davis* considers whether the plaintiff "fairly and adequately represent[s] *the interests of similarly situated shareholders* in enforcing the corporations' rights" as required by Federal Rule of Civil Procedure 23.1. *Davis*, 619 F.2d at 592 (emphasis added) (internal quotation mark omitted) (quoting *Robinson*, 75 F.R.D. at 641). Mississippi law does not look at the shareholders or members similarly situated but instead to whether the plaintiff fairly and adequately represents the interests of the limited liability company. There is an important difference as to whose interest is to be represented.

¶138. We must carefully examine the governing language of Section 79-29-1103 versus Federal Rule of Civil Procedure 23.1(a). In both, "the interests" are to be "fairly and adequately represent[ed]." But the object of the preposition "of" explains whose interests are to be fairly and adequately represented. In the federal rule, "the interests of shareholders or members" are to be fairly and adequately represented. F.R.C.P. 23.1(a). Under the Mississippi statute, however, "the interests of the limited liability company" are to be fairly and adequately represented. §79-29-1103.

¶139. Neither the chancellor nor the majority have made any effort to consider this difference. Instead, both cited *Davis* for a simple definition of the words "fairly and adequately" and gave no consideration to who is to be represented.

¶140. In fact, the majority opinion conflates this difference. The majority states "the **Davis** factors have been applied by courts for aid in a determination of *whether a plaintiff can fairly and adequately represent **an entity** in a derivative action, which is Mississippi's statutory standard*." Maj. Op. ¶ 37 (emphasis added). This is simply not an accurate statement.

¶141. The **Davis** factors were created for courts to determine whether, under Rule 23.1(a), the derivative plaintiff represents "*the interests of shareholders or members who are similarly situated in enforcing the right of a corporation or association*." The **Davis** factors were not created nor applied to decide "whether a plaintiff can fairly and adequately **represent an entity**[.]" Maj. Op. ¶ 37 (emphasis added). The federal test does not consider the representation of the entity. Instead, it looks only at the similarly situated shareholders or members.

¶142. It is error as a matter of law for the chancellor and the majority to have applied **Davis** and the **Davis** factors, which are based on Rule 23.1(a), not Section 79-29-1103. These tests are different and cannot be used interchangeably. There is no basis in Mississippi law to apply **Davis**, the **Davis** factors, or Rule 23.1(a). We must instead follow the clear language of Section 79-29-1103, which the majority has failed to do in this case.

> 2. *The **Davis** court actually reviewed the derivative claims.*

¶143. In addition, the **Davis** trial court actually reviewed the derivative claims. Here, the chancellor and the majority have not. The Sixth Circuit in **Davis** looked carefully at Davis's claim that sought to rescind Comed's sale of hospital property to University Research

58

Corporation. *Davis*, 619 F.2d at 589. The court looked closely at Davis's ownership interest in Comed and C.M.S., the parent company of Comed. *Id.*

¶144. Davis and his wife owned one hundred shares of Comed common stock. *Id.* At the shareholders' meeting, Comed shareholders voted 13,702 to one hundred to ratify the transactions. *Id.* at 592. Also, Davis and his wife owned 2,975 of C.M.S. stock. *Id.* at 589. At the shareholders' meeting, C.M.S. shareholders voted 2,723,844 to 20,540 to ratify the transactions. *Id.* at 592. The court recognized that the Davises sold their Comed stock after trial for $2,500. *Id.* at 591. Moreover, it was relevant that the only opposition to the transactions was by Davis and a friend. *Id.* at 592. The court recognized there was evidence that also established that Davis and his friend considered the acquisition of the property through foreclosure and wanted to develop the property for their personal gain, contrary to the "best interests of the shareholders of Comed and C.M.S." *Id.* Davis sought to compete with the shareholders he claimed to represent. *Id.*

¶145. The Sixth Circuit provided more than just a simple application of an eight-factor test. *Id.* More important, the trial court made its decision on derivative standing *after a trial on the merits* of the claims asserted in the complaint. *Id.* In fact, the trial court focused on the actual claims asserted, the evidence in support of and in defense of the claims, and the decision was made based on the facts in evidence that were applied to the specific claims asserted by the derivative plaintiff. *Id.* The Sixth Circuit noted:

> The defendants included the above-named corporations, along with certain others and a number of individuals. The defendants all filed answers to the complaints denying any wrongdoing. More than four years after the complaint was filed and after extensive discovery, including the taking of numerous

depositions and the filing by plaintiffs of a Third Amended and Supplemental Complaint (the filing of a Fourth Amended and Supplemental Complaint was denied), the District Court heard additional evidence. Many exhibits were offered. The court adopted Findings of Fact and Conclusions of Law.

*Id.* at 589–90.

¶146. It is important that the trial court in ***Davis*** made its decision on derivative standing *after a trial on the merits* of the derivative claims asserted in the complaint. ***Id.*** at 589, 591. The ***Davis*** court considered testimonial and documentary evidence that was properly admitted at trial and subject to cross-examination. ***Id.*** at 591, 597–98. Here, the chancellor disqualified Jill on a pretrial motion based on a summary argument of counsel and a few documents submitted. Unlike ***Davis***, no testimonial or documentary evidence was admitted or challenged on cross-examination. There was no review of the facts based on either a Mississippi Rule of Civil Procedure 12(b)(6)[18] or 56(c) standard.

¶147. This case should be remanded for the chancellor to review the derivative claims asserted to decide whether Jill fairly and adequately represents the interests of Livingston Holdings, LLC, in enforcing the right of Livingston Holdings, LLC.

### 3. ***Cattano*** supports Jill's argument.

¶148. It is interesting that the majority cites ***Cattano***, 727 S.E.2d 625. Maj. Op. ¶¶ 32–34. In fact, the majority recognizes that the Virginia court in ***Cattano*** ruled that "under the totality

---

[18] Rule 12(b)(6) review is "limited to the face of the pleading[,]" ***Jourdan River Ests., LLC v. Favre***, 212 So. 3d 800, 802–03 (Miss. 2015) (citing ***Hartford Cas. Ins. Co. v. Halliburton Co.***, 826 So. 2d 1206, 1211 (Miss. 2001)), is based on the "legal sufficiency of the complaint," ***id.*** (internal quotation marks omitted) (quoting ***Cook v. Brown***, 909 So. 2d 1075, 1077–78 (Miss. 2005)), and accepts "the allegations in the complaint . . as true[.]" ***Id.*** (citing ***Rose v. Tullos***, 994 So. 2d 734, 737 (Miss. 2008)).

of the circumstances, Bragg had derivative standing." Maj. Op. ¶ 34 (citing *Cattano*, 727 S.E.2d at 630). Yet the majority gives no credence to the *Cattano* decision.

¶149. In *Cattano*, the Virginia Supreme Court reexamined its reliance on the *Davis* factors when presented with a derivative action on behalf of a corporation with only two shareholders.

¶150. The Virginia court recognized the difference in a derivative plaintiff in *Davis* as opposed to a derivative plaintiff in a closely held entity. The court ruled that there was an important distinction. "Only in the rarest instances may there be a shareholder derivative action with a class of one[,]" *Cattano*, 727 S.E.2d at 628 (internal quotation marks omitted) (quoting *Smith v. Ayres*, 977 F.2d 946, 948 (5th Cir. 1992)), and "[i]nstances of a two-shareholder corporation may be precisely the sort of rare instance suggested in *Ayres*." *Id.* at 628. The Virginia court stated:

> ***While the present case contains economic antagonism as well as apparent animosity between the Firm's only two shareholders, we do not find this to be a determinative factor when evaluating a closely held corporation; nor do we find it determinative that the sole other shareholder does not support the derivative suit.*** *To so hold would be to enact* ***a de facto bar on derivative suits in two-shareholder corporations. Charged emotions and economic antagonism are virtually endemic to disputes in closely held corporations.*** *Nevertheless, a single shareholder derivative claim is still possible, provided that the totality of the circumstances support a finding that the plaintiff's personal interests do not preclude the shareholder from fairly and adequately representing the corporation.* ***In closely held corporations, we must look beyond the mere presence of economic and emotional conflict, placing more emphasis on whether the totality of the circumstances suggest that the plaintiff will vigorously pursue the suit and that the remedy sought is in the interest of the corporation.***

*Id.* at 629 (emphasis added) (citation omitted). The court then concluded:

We hold that, applying the ***Jennings*** [***v. Kay Jennings Family Ltd. P'ship***, 659 S.E. 2d 283, 288 (Va. 2008) (where the Virginia Supreme Court adopted the ***Davis*** factors)] factors to the specific facts of this case, ***the "totality of the circumstances" combine to show that Bragg "[f]airly and adequately represent[ed] the interests of the corporation***" as required under Code § 13.1–672.1(A). *The remedy sought—the return of funds, misappropriated by an officer, to the corporation—is highly appropriate for a derivative claim.* There is no evidence in the record of external parties motivating Bragg, and she is intimately familiar with the litigation. *Bragg's additional individual claims—breach of contract and judicial dissolution—do not reflect an inappropriate conflict of interest. Significantly, as a portion of the funds returned would go to her upon dissolution, Bragg's personal interests are in line with those of the corporation, so that the return of assets to the Firm will clearly be vigorously litigated.*

. . . .

Whether winding up or not, it is clearly in the interest of the corporation to have misappropriated funds returned, and the verdict returned tangible assets to the Firm. Judicial dissolution is a remedial mechanism that exists in addition to, rather than as a substitute for, shareholders rights. It therefore cannot act as a per se bar to a derivative claim.

Given the totality of the circumstances, *we conclude that the circuit court did not err in failing to strike the derivative claim* under Code § 13.1–672.1(A).

***Id.*** at 629–30 (emphasis added) (citation omitted).

¶151. Further, it is important to note that the ***Cattano*** court ruled that "[t]he remedy sought—the return of funds, misappropriated by an officer, to the corporation—[was] highly appropriate for a derivative claim," there was no evidence of external motivations, and the plaintiff's personal interests were "in line with those of the corporation" and would be "vigorously litigated." ***Id.*** at 629. Here, if you actually examine the derivative claims asserted, Jill seeks the return of funds to Livingston Holdings, LLC.

¶152. In *Cattano*, the issue of standing was not presented to the jury because there was no dispute among the parties of the facts relevant to the standing factors. *Id.* at 627, 630. The Virginia Supreme Court determined that "[n]o finding of fact was required as to this issue" because the "parties acknowledged their economic antagonism," did not "dispute . . . the remedy sought," "the defendant did not allege that a third party was the driving force behind the litigation or that Bragg was unfamiliar with the litigation," the parties recognized that "Bragg had a direct personal interest in recovering funds . . . and that she stood to benefit from attorneys' fees." *Id.* at 630. Nevertheless, just like *Davis* and unlike the case before us, the trial court in *Cattano* considered the possible disqualification after a trial on the merits.

¶153. In *Cattano*, the court recognized that "[i]n closely held corporations, we must look beyond the mere presence of economic and emotional conflict." *Id.* at 629. Instead, the court concluded that it should "plac[e] more emphasis on whether the totality of the circumstances suggest that the plaintiff will vigorously pursue the suit *and that the remedy sought is in the interest of the corporation*." *Id.* (emphasis added). Thus, *Cattano* determines that the test of whether the derivative plaintiff fairly and adequately represents the interests of the entity should focus on whether the claims and remedy sought in the derivative claims is in the interest of" Livingston Holdings, LLC. As required in *Mathis*, 25 So. 3d 298, the court must look at the actual claims asserted and remedies sought to decide whether the derivative claims are best for the entity—Livingston Holdings, LLC.

¶154. This case is a dispute over millions of dollars invested in a $100 million commercial development that has lasted more than fifteen years. I dare say there are legitimate and valid

63

reasons for Jill, the Sharpes, Bollenbacher, and others, to be antagonistic and vindictive. Under Mississippi law, their search for revenge or legal compensation from hostile parties is not a reason for the court not to consider the claims.

¶155. Here, the chancellor and the majority have ignored the actual wording of the factors and dismissed *Cattano*. Factor One says "economic antagonisms between the representative and members of the class," not between the representative and other defendants. *Cattano*, 727 S.E.2d at 629 (citing *Davis*, 619 F.2d at 593–94). Likewise, in *Cattano*, the Virginia court gave four warnings:

[a.] While the present case contains economic antagonism as well as apparent animosity between the Firm's only two shareholders, we do not find this to be a determinative factor when evaluating a closely held corporation;

[b.] nor do we find it determinative that the sole other shareholder does not support the derivative suit. To so hold would be to enact a de facto bar on derivative suits in two-shareholder corporations.

[c.] Charged emotions and economic antagonism are virtually endemic to disputes in closely held corporations. Nevertheless, a single shareholder derivative claim is still possible, provided that the totality of the circumstances support a finding that the plaintiff's personal interests do not preclude the shareholder from fairly and adequately representing the corporation.

[d.] In closely held corporations, we must look beyond the mere presence of economic and emotional conflict, placing more emphasis on whether the totality of the circumstances suggest that the plaintiff will vigorously pursue the suit and that the remedy sought is in the interest of the corporation.

*Id.* at 629 (citation omitted).

¶156. The decisions by the chancellor and the majority here are based on the applicability of three *Davis* factors. The first was "plaintiff's vindictiveness towards the defendant[.]" The second was the "relative magnitude of the plaintiff's personal interests as compared to the interests in the derivative action itself as being particularly controlling to this Court." The third was "also certain economic antagonisms that are on full display and argued here today[.]"

¶157. The chancellor held that "certain economic antagonisms" was one reason to disqualify Jill as a derivative plaintiff. Despite the discussion in *Cattano*, neither the chancellor nor the majority ever recognize or consider that the actual *Davis* factor states "economic antagonisms *between representative and class*[.]" *Davis*, 619 F.2d at 594 (emphasis added). Certainly Jill could not be antagonistic with herself. She would be both the representative and the class. This is absurd. It is of great concern to me that both the chancellor and the majority do not consider the actual language used but instead just cherry pick two of the six words.

¶158. Next, the chancellor's order ruled that "plaintiff's vindictiveness towards the defendant" was one reason to disqualify Jill. Although there are numerous defendants, neither the chancellor's order nor the majority's opinion identify exactly who is the "defendant" referred to in the order. It could be Livingston Holdings, LLC, B&S, Bollenbacher, or several other defendants. No one knows who the chancellor found Jill was vindictive toward.

¶159. Again, the *Cattano* court recognized that "[c]harged emotions and economic antagonism are virtually endemic to disputes in closely held corporations." *Cattano*, 727 S.E.2d at 629. The court also acknowledged that "[i]n closely held corporations, we must

65

look beyond the mere presence of economic and emotional conflict, placing more emphasis on whether the totality of the circumstances suggest that the plaintiff will vigorously pursue the suit and that the remedy sought is in the interest of the corporation." *Id.* Vindictiveness should not be considered here.

¶160. The majority characterizes this case as: "[t]wo friends go into business together," "while it sounds like the start of a bad joke it is, in fact, often the start of a bitter lawsuit[,]" "a garden-variety monetary dispute that germinated from a deal between" two friends, "[t]he deal went sideways," and "[t]his dispute sprouted into animosity and bloomed into full warfare." Maj. Op. ¶ 1 (emphasis added). The majority then adds a famous quote from the world's richest man, "A friendship built on business can be glorious, while a business built on friendship can be murder."[19] Maj. Op. ¶ 1 n.1 (emphasis added). The majority's own language frames the justification for the economic antagonism and vindictiveness between the parties.

¶161. No Mississippi authority deprives a proposed derivative plaintiff the right to pursue a legal claim because the chancellor or this Court perceives her motivation for filing the

---

[19] Contrary to the majority's suggestion, I take no exception to John D. Rockefeller's choice of a metaphor. It is accurate and explains the justification for Jill's behavior. It is unfortunate, however, that the majority has chosen to use metaphors like "warfare" and "murder" to describe this dispute and litigation. Maj. Op. ¶ 1, ¶ 1 n.1. It seems that the majority's choice of metaphors explains Jill's legitimate reasons to justify her vindictiveness, hostility, and antagonism.

Nevertheless, litigation is not war, and it is not murder. The casualties of war and murder are measured in lives and not money. The use of such terms to describe civil disputes and litigation do not advance the effort to improve civility and professionalism in the practice of law.

derivative claim as vindictive and antagonistic. In ***Davis***, these were factors only because the decision was based on a comparison of the potential derivative plaintiff and "***the interests of similarly situated shareholders***[.]" ***Davis***, 619 F.2d at 592 (emphasis added) (quoting ***Robinson***, 75 F.R.D. at 641). The court in ***Cattano*** warned that the ***Davis*** factors were based on Rule 23.1 and that courts should be careful when applying the federal test when the state standard differs. ***Cattano***, 727 S.E.2d at 628–29.

¶162. The fact is that most, if not all, civil lawsuits are brought because of the plaintiffs' personal interests. Such is a valid and legitimate reason to bring a lawsuit. Frankly, under Section 79-29-1103, Jill's personal interests are not a factor or reason to deny her derivative standing. The proper test is whether Jill fairly and adequately represents Livingston Holdings, LLC. Only if the derivative claims have merit and result in damages will Jill receive a personal monetary benefit.

¶163. Jill's personal interests would come into consideration under the federal test, Rule 23.1(a). There, the rule makes a comparison between the ***interests of shareholders or members who are similarly situated***. Under Rule 23.1(a), it makes perfect sense that the representative of the shareholders who are similarly situated should not be motivated by their personal greed.

¶164. Legal claims are often filed to recover personal damages. In fact, that is the most common reason to file a civil lawsuit. In many instances, the defendant may perceive that the claimant's motivation for the litigation is to seek revenge. However, the claimant's intentions may simply be the pursuit of just, fair, adequate, and legal compensation. Unfortunately,

litigants are often openly hostile and antagonistic to their opposition. Lawyers are too. That is why the Mississippi Bar advocates for civility and professionalism among the members of the Bar. Yet none of these reasons are a valid or legitimate legal ground to disqualify a derivative plaintiff under Mississippi law nor are they reasons to dismiss the litigation.

¶165. Jill properly brought this lawsuit to recover monetary damages. She asserted that the defendants committed some wrong (tort law) or breach (contract law). Such perceived wrongs or breaches understandably often create ill feelings between the parties. This lawsuit is based on the parties' strong disagreement that has led to significant financial losses of a project estimated to be valued at approximately $100 million. Certainly, it is understandable that a significant minority (49 percent) owner of the company, who made a substantial financial investment in the project and felt wrongfully cheated out of assets and value of the project, may commence this legal action because she is mad, vindictive, and wants to recover her personal damages.

¶166. The majority offers no Mississippi authority for the finding that the courthouse door should be closed to Jill because her intentions or motivation may be considered to be antagonistic or vindictive or that they involve seeking personal damages. *Cattano* supports Jill's position. There are other Mississippi authorities that should also be considered in making this determination of whether the courthouse door should be closed on Jill's derivative claims.

¶167. The majority simply dismisses the ruling in *Cattano*, citing it as a case decided "under a different set of facts[.]" Maj. Op. ¶ 39 n.7. The majority refers to its own fact finding effort,

68

because the chancellor did not consider this totality of the circumstances test the majority now advocates.

¶168.   Then, in paragraph 39, the majority states "other jurisdictions consider animosity and vindictiveness as factors when determining if a plaintiff has derivative standing in a closely held corporation.  *Smith v. Ayres*, 977 F.2d 946, 949 (5th Cir. 1992); *Boathouse at Breach Inlet, LLC, ex rel. Stoney v. Stoney*, 900 S.E.2d 483, 491–92 (S.C. Ct. App. 2024); *Tufo v. Tufo*, 196 N.E.3d 58, 73–74 (Ill. App. Ct. 2021)."  We should examine these cases more carefully.  *Stoney* is directly on point here, while *Smith* and *Tufo* are not.

¶169.   In *Smith*, the federal district did not err by concluding that the derivative shareholder "does not qualify as a fair and adequate representative of shareholder interests under Rule 23.1."  *Smith*, 977 F.2d at 949.  In *Tufo*, the court determined that the derivative plaintiff

> did not have standing to bring a derivative action on behalf of Discount Fence because plaintiff knew about defendant's wrongful conduct prior to becoming a shareholder and because of plaintiff's personal animosity toward defendant. The court also determined that, despite its finding that defendant had breached his fiduciary duty to Discount Fence, plaintiff had failed to present specific evidence of damages stemming from that breach. The court further found that plaintiff was not entitled to an equitable accounting because he did not have standing to maintain a derivative action and because plaintiff had received all of Discount Fence's books and records through discovery during the course of the litigation.

*Tufo*, 196 N.E.3d at 62–63.  Here, Jill did not know of the wrongful conduct before she became a member, and personal animosity was present before she became a member.

¶170.   Then, in *Stoney*, 900 S.E.2d at 493, the South Carolina court held that the trial court "erred in finding Laurence [the derivative plaintiff] lacked standing to bring this derivative

action on behalf of the Company." This decision provides a great explanation for Jill's position here.

¶171. First, the court explained how we should consider derivative actions for closely held entities:

> The Utah Supreme Court similarly held that due to "the greater vulnerability to malfeasance that is present in closely held corporations" a single shareholder could maintain a derivative action as a "class of one" when the shareholder "(1) seeks by its pleading[s] to enforce a right of the corporation and (2) does not appear to be similarly situated to any other shareholder." *Angel Invs. LLC v. Garrity*, 216 P.3d 944, 951 (Utah 2009). As the Texas Supreme Court noted, "The rule does not place any minimum numerical limits on the number of shareholders who must be 'similarly situated.' It follows that if the plaintiff is the only shareholder 'similarly situated,' he is in compliance with both the letter and the purpose of the rule." *Eye Site, Inc. v. Blackburn*, 796 S.W.2d 160, 162–63 (Tex. 1990).

> Numerous other courts have recognized a "class of one" may maintain a derivative action. *See, e.g., Larson v. Dumke*, 900 F.2d 1363, 1368 (9th Cir. 1990) (holding "a single shareholder may bring a derivative suit"); *Jordon v. Bowman Apple Prods. Co.*, 728 F. Supp. 409, 412 (W.D. Va. 1990) ("In appropriate circumstances a single shareholder may be situated in a unique position and thus constitute a legitimate 'class of one.' "); *Halsted Video, Inc. v. Guttillo*, 115 F.R.D. 177, 180 (N.D. Ill. 1987) (holding the plaintiff was a "legitimate class of one" and the defendants did not meet their burden of showing that plaintiff was an inadequate representative); *Brandon v. Brandon Constr. Co.*, 300 Ark. 44, 776 S.W.2d 349, 353-54 (1989) ("The real test is not the number of shareholders represented in a derivative action, but the alleged injuries and the remedies sought."); *Clemons v. Wallace*, 42 Colo. App. 17, 592 P.2d 14, 16 (1978) (holding Rule 23.1 of the Colorado Rules of Civil Procedure did not preclude a derivative suit by a corporation with only one minority stockholder); *HER, Inc. v. Parenteau*, 147 Ohio App.3d 285, 770 N.E.2d 105, 114 (2002)(holding that the appellant, who was "the only similarly situated shareholder, can fairly and adequately represent the interests of the corporation.").

> We agree with the above cases and hold that under the appropriate circumstances, a single member of a limited liability company may "fairly and adequately represent the interests of" a class of one and have standing to

maintain a derivative action. To hold otherwise would be to deprive a sole dissenting shareholder from seeking relief from another shareholder's wrongdoing. *Eye Site, Inc.*, 796 S.W.2d at 163 ("[W]e question the wisdom of construing [the rule] in any manner which prevents a shareholder in a close corporation from enforcing his rights.").

*Stoney*, 900 S.E.2d at 490–91.

¶172. Next, the court discussed the "vindictiveness" factor:

We next address whether Laurence's vindictiveness towards Richard motivated him to bring this action. We must keep in mind that "[c]harged emotions and economic antagonism are virtually endemic to disputes in closely held corporations." *Cattano*, 727 S.E.2d at 629. We therefore "must look beyond the mere presence of economic and emotional conflict, placing more emphasis on whether the totality of the circumstances suggest that the plaintiff will vigorously pursue the suit and that the remedy sought is in the interest of the corporation." *Id.*

Ted characterized the relationship between Richard and Laurence as being "as bad as you can get" and recalled Laurence threatened to "get Richard" and "turn his world upside down." Although Richard described Laurence as being humble, gracious, and enjoyable to be around at the time they formed the Company, he claimed that by the time they formed BEB, their relationship had deteriorated. The change in their relationship coincided with Richard using the Company's funds to support his other entities and personal expenses, which upset Laurence. In an email dated June 23, 2010, Richard criticized Laurence for being abrasive and threatening litigation, but in the same email, he acknowledged Laurence had not been receiving distributions because profits from the Company were used to support other entities. Ted recalled Laurence "claimed that monies were being diverted from the [Company] to pay for other entities," and he complained about not getting proper distributions from the Company. Laurence acknowledged his concern was the money missing from the Company, but he explained that in bringing this action, he sought to recover the money owed to the Company and use it to make the Restaurant a showpiece. No one disputes Richard owes the Company over $4 million. With this action, Laurence seeks to return this money to the Company. While animosity certainly exists between the parties, we hold this hostility is not fatal to Laurence maintaining the derivative action.

*Stoney*, 900 S.E.2d at 491–92 (alterations in original) (footnote omitted).

71

¶173. The court then offered the following about the "economic antagonism" factor:

> We further hold the remaining **Davis** factors support Laurence's standing to bring this action. *See **Davis***, 619 F.2d at 593–94 (listing the factors as "economic antagonisms between representative and class; the remedy sought by plaintiff in the derivative action; indications that the named plaintiff was not the driving force behind the litigation; plaintiff's unfamiliarity with the litigation; other litigation pending between the plaintiff and defendants; [and] the relative magnitude of plaintiff's personal interests as compared to his interest in the derivative action itself"). Laurence was the driving force of this litigation and was familiar with the proceedings. As far as the record shows, there is no other litigation pending between Laurence and Richard. Laurence has only a five-percent interest in the Company, but *he sought to make Richard reimburse the Company over $4 million*. As stated above, no one contests that Richard used the Company's funds to support his other entities and personal expenses. Laurence presented evidence that Richard's use of these funds hurt the Company, at times causing it to be unable to make payroll, incur late fees, and owe money to the IRS. *Without a doubt, the return of over $4 million would benefit the Company*. In addition, to support his breach of fiduciary duty claim, Laurence presented evidence that Richard used the Company as the guarantor for personal loans and modified the Company's lease to make it more beneficial to Richard as landlord. Laurence prosecuted this action vigorously and declared his intent for the proceeds of the action to be returned to the Company to improve the Restaurant. *Therefore, we hold Laurence fairly and adequately represented the interests of the class of one in prosecuting this derivative action for the benefit of the Company*. *See **Cattano***, 727 S.E.2d at 629 ("[W]e must look beyond the mere presence of economic and emotional conflict, placing more emphasis on whether the totality of the circumstances suggest that the plaintiff will vigorously pursue the suit and that the remedy sought is in the interest of the corporation.").

*Stoney*, 900 S.E.2d at 492.

¶174. Most important, the court then ruled:

> To deny Laurence standing in the derivative action would deny him and the Company a remedy, which we find is not the intent of Rule 23(b)(1). *See **Eye Site, Inc.***, 796 S.W.2d at 163 ("[W]e question the wisdom of construing [the derivative standing rule] in any manner which prevents a shareholder in a close corporation from enforcing his rights."). Accordingly, we hold the circuit court erred in finding Laurence lacked standing to bring this derivative action on behalf of the Company.

***Stoney***, 900 S.E.2d at 493.

¶175. Of all the cases cited by the majority, ***Cattano*** and ***Stoney*** are the most factually similar to this case. In both of these cases, the Virginia and South Carolina courts ruled the minority shareholders could fairly and adequately represent the corporations and, just like Jill Landrum, were proper derivative plaintiffs.

#### C. Conclusion

¶176. The test in this case is simple. Under Section 79-29-1103, the chancellor had to decide whether Jill fairly and adequately represents the interests of Livingston Holdings, LLC, in enforcing the right of Livingston Holdings, LLC. There was no legal basis for the chancellor to rely on ***Davis***, the ***Davis*** factors, or Federal Rule of Civil Procedure 23.1. The rule is not that Jill must fairly and adequately represent the interests of all other shareholders or members. Rather, Jill must fairly and adequately represent Livingston Holdings, LLC. There is simply no way a court can undertake this review and not consider the actual claims alleged to determine if the pursuit of such claims is in the interests of Livingston Holdings, LLC.

¶177. Jill should have her day in court on the derivative claims asserted. She should not have been summarily disqualified, and the derivative claims should not be summarily dismissed. For these reasons, I respectfully dissent as to this issue. I would reverse and remand this case for further proceedings.

#### II. Whether the chancellor erred by denying Jill's Mississippi Rule of Civil Procedure 52(a) motion.

¶178. Jill Landrum asked the chancellor to make specific factual findings, under Mississippi Rule of Civil Procedure 52(a) in the order disqualifying her as a derivative plaintiff. The

chancellor denied the request and stated that he had already made sufficient findings of facts in the order.

¶179. Rule 52(a) provides: "[i]n all actions *tried upon the facts* without a jury the court . . . shall upon the request of any party to the suit . . . find the facts specially . . . thereon and judgment shall be entered accordingly." The advisory committee notes add that, "[i]n contested complex cases, a trial court's 'failure to make findings of ultimate fact and conclusions of law will generally be regarded as an abuse of discretion.'" M.R.C.P. 52 advisory comm. n. (quoting *Tricon Metals & Servs., Inc., v. Topp*, 516 So. 2d 236, 239 (Miss. 1987)).

¶180. The majority rules that "[t]his Court has previously limited the application of Rule 52 in the context of a motion for summary judgment, and we find that same logic applies here. *Harmon v. Regions Bank*, 961 So. 2d 693, 700 (Miss. 2007)." Maj. Op. ¶ 58. This is an absurd comparison.

¶181. In *Harmon*, this Court held that Rule 52(a) does not apply to a summary judgment. *Harmon*, 961 So. 2d at 700. Rule 56(c) provides that a summary judgment is proper only if there is "no genuine issue as to any material fact." A summary judgment does not decide facts. Rather, the court merely decides if there are facts to be decided. *Brown v. Credit Ctr., Inc.*, 444 So. 2d 358, 362 (Miss. 1983). *Harmon* offers no guidance here.

¶182. The majority recognizes that this decision of whether Jill was a proper derivative plaintiff was a factual decision.[20] Maj. Op. ¶ 27. The chancellor heard testimony, considered

---

[20] *See, e.g., **Mason v. Mazzei**,* No. 1:22CV00008, 2023 WL 2555692 (W.D. Va. March 17, 2023) (Virginia district court opinion with findings of fact and conclusions of law under Federal Rule of Civil Procedure 52 on issue of derivative standing).

documentary evidence, and made a factual finding that led to the ultimate dismissal of a significant number of the plaintiffs' claims in this litigation. Jill asked the chancellor to find the facts specially under Rule 52(a).

¶183. In its statement of the applicable standard of review, the majority finds that the chancellor's factual findings are to be reviewed for an abuse of discretion. Yet the majority cannot cite any factual findings made by the chancellor at the hearing or in his order. Indeed, the chancellor made no factual findings. Despite the absence of the chancellor's factual findings, the majority details its factual findings in paragraphs 40 through 51.

¶184. Chancellors have a duty to follow Rule 52(a) and provide the parties and appellate courts with the benefit of their findings of ultimate facts, when requested. Likewise, this Court has a duty to enforce Rule 52(a), and this Court should not act as the fact-finder.

¶185. The majority is correct: "[t]he chancellor was in the best position to resolve each of these factual scenarios, and we give deference to his finding. *Frazier v. Shackelford (In re Est. of Carter)*, 912 So. 2d 138, 143 (Miss. 2005)." Maj. Op. ¶ 53. Unlike the majority, I would remand this matter to the chancellor and require the chancellor to "find the facts specially" that support the order of disqualification. M.R.C.P. 52(a). I would not, as my colleagues in the majority now do, become the fact-finder simply because the chancellor failed to do so.

> III. *Whether the chancellor erred by denying Jill's Mississippi Rule of Civil Procedure 54(b) motion.*

¶186. I concur in the result reached by the majority.

75

¶187. In *Miller v. Continental Mineral Processing*, 39 So. 3d 998, 1000 (Miss. Ct. App. 2010) (citations omitted), now-Justice Maxwell wrote on behalf of the Court of Appeals:

> Absent a Rule 54(b) certification, an order granting partial summary judgment is interlocutory. Such an order is not appealable unless the supreme court grants permission to appeal from an interlocutory order pursuant to Mississippi Rule of Appellate Procedure 5. In the present case, no permission was sought or granted.

¶188. The only remedy for the trial court's failure to enter a Rule 54(b) certification is to file a petition for interlocutory appeal under Mississippi Rule of Appellate Procedure 5. This issue is moot.

> *IV.    Claims for Breach of Fiduciary Duties*

¶189. I agree with the majority that David Landrum was owed no fiduciary duty and that any finding of fiduciary duty must be limited to Jill. Maj. Op. ¶ 66. Contrary to the majority's finding that the chancellor only erred by failing to recognize a fiduciary duty existed between Jill and B&S, Maj. Op. ¶ 72, I would find that the chancellor erred by not fully analyzing the fiduciary relationships amongst all the entities as defined in *Fought* and *Knox Glass*.

¶190. The chancellor failed to consider *Fought*, specifically this Court's ruling that "directors and officers of a corporation stand in a fiduciary relationship to the corporation and its stockholders. These duties include exercising the utmost good faith and loyalty in discharge of the corporate office. . . ." *Fought*, 543 So. 2d at 171 (citing *Gibson v. Manuel*, 534 So. 2d 199 (Miss. 1988)). The *Fought* Court considered *Knox Glass*, in which this Court held:

> Since the directors and other officers of a corporation, *whatever their relation may be technically, occupy a fiduciary or quasi trust relation toward the corporation and the stockholders collectively, it is thoroughly well settled that they cannot, either directly or indirectly, in their dealings on behalf of the*

76

*corporation with others, or in any other transaction in which they are under a duty to guard the interests of the corporation, make any profit, or acquire any other personal benefit or advantage, not also enjoyed by the other stockholders, and, if they do so, they may be compelled to account therefore to the corporation in an appropriate action.*

***Knox Glass***, 89 So. 2d at 814–15 (emphasis added).

¶191. The convoluted interrelated relationships of the individuals, LLCs, and corporations involved here were not simply arms-length transactions. There were fiduciary relationships between Jill, Livingston Holdings, B&S, Bollenbacher, and the other interrelated entities. Further analysis of other single-member LLCs that participated in this complex commercial development cannot be brushed aside without an in-depth review of the ownership and interconnections. The chancellor performed no such analysis to determine whether these entities owed fiduciary relationships to Jill or to Livingston Holdings.

¶192. Before the trial court, the Landrums presented evidence of breaches of fiduciary duties and the duties of good faith, loyalty, and fair dealing. The Landrums established that breaches resulted from entering into the JVA through a nonexistent entity; the failure to obtain funding, as required by the JVA, opting instead to finance projects outside the JVA; taking advantage of Livingston's financial troubles with respect to the Primos property; failing to honor the soft equity arrangement with respect to the Fund One/commercial properties; undisclosed negotiations and dealings; devoting time and resources to other real estate projects within Madison County but outside the Town of Livingston, while BankPlus issued demand on its promissory note; misrepresentations as to the need for the Second MOU; misrepresentations as to the construction of Cottages upon execution of the Second MOU; acting against the best

77

interests of Livingston in negotiations with Todd Sandridge/Crosstown Builders, including the insistence on paying non-Livingston creditors and unsecured creditors over secured creditors; filing of a complaint to judicially dissolve Livingston; filing of a complaint to prevent Jill from filing a derivative action; removing valuable and unencumbered property from Livingston without any notice to either of the Landrums; and misappropriating tax losses among the members of Livingston contrary to the operating agreement/Second MOU.

¶193. I would remand this matter to the chancery court for further proceedings in line with *Fought* and *Knox Glass*.

### VI. *Exclusion of the Landrums' Expert Witness*

¶194. The majority over complicates this simple issue. The majority cites the standard from *Webb v. Braswell*, 930 So. 2d 387 (Miss. 2006) regarding speculative damages, but it is wholly unnecessary to determine in this case whether or not Scott Womack's testimony was relevant and reliable so as to be admissible.

¶195. When evaluating the admissibility of expert testimony, the trial court utilizes a two-pronged inquiry: "(1) is the witness qualified, and (2) is the testimony relevant and reliable?" *Watts v. Radiator Specialty Co.*, 990 So. 2d 143, 146 (Miss. 2008) (citing *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 35 (Miss. 2003)). The expert opinion is relevant if it will assist the trier of fact. *Baumann v. Baumann*, 304 So. 3d 175, 181 (Miss. Ct. App. 2020). A witness is qualified if their opinion is based on scientific methods and procedures and not mere speculation. *McLemore*, 863 So. 2d at 36.

¶196. The chancellor excluded the proffered witness's testimony under *both* prongs, finding him unqualified to testify as to the lost-profits/damages matter and finding that the testimony was "far too speculative" to be relevant. The Landrums challenge *only* the court's finding that the testimony was not relevant—they do not raise any arguments as to whether or not their expert witness was *qualified* to testify. Because they do not challenge his qualifications in either the opening brief or the reply brief, I would affirm the chancellor's decision to exclude the witness, as the Landrums have not satisfied the first part of the test. Even if the Court were to consider the question, as the majority does, the expert witness was clearly unqualified by his own admissions during his voir dire examination.

*VII. The Second MOU*

¶197. I disagree with the majority's holding that the remedy in Paragraph 13 is nonexclusive. The majority concludes that because "Jill has admitted to actions that constitute a default under the terms of the agreement[,] [t]he parties agreed . . . they would be entitled to pursue 'all rights and remedies available in law and in equity[.]'" Maj. Op. ¶ 100. I agree with the chancellor's finding that the purpose of the Second MOU was to equalize the partners' capital accounts, and because the tax returns showed that Jill's capital account was positive, there was no breach, and Livingston suffered no damages.

¶198. The chancellor determined that Paragraph 13 of the Second MOU established an exclusive remedy for a breach of contract in regard to Paragraph 11, which established the required capital contributions. Livingston argues, and the majority agrees, that no such

79

exclusive remedy existed because of the inclusion of Paragraph 20, entitled "Rights and Remedies." The provisions of the agreement at issue are as follows:

> 13. <u>Failure to Make Required Capital Contributions.</u>
> (a)(i) in the event that Landrum fails to make any Required Capital Contribution as provided in Section 11 and such failure is not cured within fifteen (15) days following written notice from Sharpe to Landrum of such failure or (ii) in the event that Landrum fails for three (3) consecutive months to make the Required Capital Contribution on or before the 20th of the applicable month as provided in Section 11 and Sharpe has provided Landrum written notice thereof, then the First Landrum Capital Increase and any Additional Landrum Capital Increases *shall automatically and without further notice be deemed deducted from and not included in the total Landrum Capital Contributions.*
>
> . . . .
>
> 20. <u>Rights and Remedies</u>
> In the event of a default under the terms of this Agreement, the parties hereto shall have all rights and remedies available in law and in equity. In the event that any party to this Agreement is found to be in default under this Agreement, such party shall pay all reasonable attorneys' fees and expenses paid by the other parties to this Agreement in connection with such default.

(Emphasis added.)

¶199. The Second MOU is not ambiguous. The inclusion of Paragraph 20 provides for any remedy available in law and equity, but the language in Paragraph 13 explicitly limits the remedy for failure to make the required capital contributions. Livingston only asserts that Jill breached the Second MOU for failure to make those contributions, and based on the "four corners" of the agreement, Paragraph 13 dictates that remedy for that breach. When read in toto, the purpose of the Second MOU is clearly to equalize any disparity amongst the parties in regard to the capital contributions. I would affirm the chancellor's finding that the Second MOU contained an exclusive remedy as it pertains to the capital contributions.

*VIII.   Attorneys' Fees*

¶200.   Finally, the majority decides it was erroneous for the chancellor not to award attorneys' fees in this case.  The majority's reasoning relies on Paragraph 20 of the Second MOU, which states that in the event of "default under this Agreement, such party shall pay all reasonable attorneys' fees[.]"  Maj. Op. ¶ 92.  Though it is true that the parties agreed to an award in the Second MOU, Mississippi Code Section 79-29-1113 states that such an award is discretionary.

¶201.   Mississippi Code Section 79-29-1113(2) (Rev. 2013) states: "On termination of the derivative proceeding[,] the court may order the plaintiff to pay any defendant's reasonable expenses, including reasonable attorney's fees, incurred in defending the proceeding if it finds that the proceeding as commenced or maintained without reasonable cause or for an improper purpose."   The chancellor found that assessing attorneys' fees in this case would be inappropriate and that the parties were not entitled to attorneys' fees *because* he explicitly denied *all* claims by *all* parties.   I would agree with the chancellor that under such circumstances where no party prevails, the award of attorneys' fees is neither mandatory nor appropriate.  It is paradoxical for the majority to hold otherwise when they are affirming the chancellor's rulings dismissing the parties' relevant claims.

¶202.   B&S and Livingston Holdings argue that the chancellor only considered the remaining counts at trial and not the fees as they would apply to Defendants that prevailed in terminating the derivative proceeding.  Though that may be, the statute permitting an award of attorneys' fees in this case states that "the court *may*" order the plaintiff to pay, not that the court "*shall.*"

It was in the chancellor's discretion whether or not fees were appropriate. B&S and Livingston do not offer any reason as to why this was an abuse of discretion not to award fees, other than saying, "the derivative statute provides for the award of attorneys' fees as does the Second MOU" and "attorney fees in this is appropriate." Thus, for the reasons mentioned above, I would find there was no abuse of discretion and affirm.

**KITCHENS AND KING, P.JJ., JOIN THIS OPINION.**